UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

                                        :

UNITED STATES OF AMERICA                              22 Cr. 117 (CS)

                                        :

    - V. -

                                        :

Jacques Jean

                                        :

----------------------------------------X

SENTENCING SUBMISSION


Dated:    White Plains, New York
          April 24, 2023

                              Federal Defenders of New York
                              Benjamin Gold
                              Attorney for Jacques Jean
                              81 Main Street
                              White Plains, NY  10601
                              (914) 428-7124


To:  The Honorable Cathy Seibel
     United States District Judge
     Southern District of New York


     Damian Williams, Esq.
     United States Attorney
     Southern District of New York
     One St. Andrews's Place
     New York, New York
     Attn:  Steven J. Kochevar
     Assistant United States Attorney

# Federal Defenders
## OF NEW YORK, INC.

Southern District
81 Main Street, Suite 300
White Plains, N.Y. 10601-4150
Tel: (914) 428-7124 Fax: (914) 948-5109

David E. Patton
*Executive Director*
*and Attorney-in-Chief*

*Southern District of New York*
*Jennifer L. Brown*
*Attorney-in-Charge*

April 24, 2023

Via Email and ECF

The Honorable Cathy Seibel
United States District Court Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

      Re:    United States v. Jacques Jean
             22 Cr 117

Dear Honorable Seibel:

In the first six months of 2021, Mr. Jean's life was unraveling. After enjoying the structure and support of an inpatient substance abuse program, followed by intensive outpatient services and sixteen months of wide-ranging and holistic care through Bridgeport's Support Court program, Mr. Jean was on his own. But then Mr. Jean lost the job that he loved, a position as a flagger that suited his intellectual disability and provided structure to his previously chaotic life. Months later, Mr. Jean's close cousin was murdered, exasperating Mr. Jean's untreated PTSD that stems from years of extreme trauma. Without any tools to control his PTSD, Mr. Jean resorted to his previous "medicine": drugs and alcohol. Mr. Jean's life continued to spiral out of control. He lost several jobs due to his cognitive limitations, found out that his girlfriend was pregnant, and then got kicked out of that girlfriend's home for drinking too much. Eventually Mr. Jean was sleeping in a car and too ashamed to ask for help. It is in this desperate state that Mr. Jean, a man with a diagnosed intellectual disability that limits his ability to problem solve, was offered an easy way out. An undercover officer offered to pay Mr. Jean a significant amount of money for drugs. Mr. Jean agreed and, after a number of transactions with that same undercover officer, some involving firearms, Mr. Jean was arrested.

Mr. Jean recognizes that he must be punished, but a sentence greater than five-years would be excessive in light of Mr. Jean's tragic life story and his debilitating mental illness and cognitive deficits. Additionally, a draconian sentence would unreasonably delay Mr. Jean's treatment, and subject Mr. Jean to unnecessarily cruel incarceration due to Mr. Jean's unique – and continuing – vulnerabilities. Under these circumstances, I ask that Your Honor impose a sentence of five-years.

The Honorable Cathy Seibel                                   Page **2** of **23**
United States v. Jacques Jean (22 Cr. 117)        Sentencing Submission (April 24, 2023)

## Mr. Jean's Tumultuous Childhood

A.  Violence, Neglect and Exposure to Drugs.

Violence, substance abuse and parental neglect were Mr. Jean's childhood realities.  Mr. Jean was born in 1985 to Shellay Jane Eborn, who was in the midst of her own extreme and prolonged battle with substance abuse.  PSR ¶ 67.  When he was born, Mr. Jean's father, Jacques Jean, Sr., was incarcerated.  *Id.* ¶ 67, 71.  Ms. Eborn used drugs during her pregnancy and her drug dependency continued for decades after Mr. Jean's birth.  *Id.* ¶ 69, fn 1.  While Mr. Jean spent some time living with his father and other family members, for the majority of Mr. Jean's childhood Mr. Jean was raised by Ms. Eborn, all while she was totally consumed by her own drug addiction, and largely within the confines of a crack house in Bridgeport, Ct.  *Id.,* Declaration of Nakia Hamlett, M.Ed., Ph.D., ¶ 17 ("Dr. Hamlett Decl.") (Ex. A).[1]

Ms. Eborn's drug addiction was so severe that she did not attempt to hide it. Shortly after his release from prison, Jacques Jean, Sr. recalls witnessing Ms. Ebron shooting crack while holding their newborn son.  PSR ¶ 67, 70, Dr. Hamlett Decl. ¶ 15 (Ex. A).  Throughout Mr. Jean's childhood, Ms. Eborn smoked crack in Mr. Jean's presence.  *Id.*  This caused young Mr. Jean to either hide the drugs, or to beg his mother to stop.  PSR ¶ 67.  Upon hearing her child's plea that she stop using drugs, Ms. Eborn would acknowledge her addiction and state that she'd only quit "When I'm ready to."  *Id.*  In one childhood home that Mr. Jean shared with his mother, Mr. Jean recalls sleeping in the living room on a cot next to two couches. *Id.*  Mr. Jean shared this room with his older cousin and that cousin's friend.  *Id.* Drug use was rampant in this home and a drug dealer (who was dating Mr. Jean's sister) eventually moved in.  *Id.*

Today, Mr. Jean recognizes that his mother's substance abuse history most likely is linked his mother's romantic partner, a woman named Pearly Young.  PSR ¶ 70, Ex. A, Dr. Hamlett Decl. ¶ 17.  Ms. Young was physically abusive to Ms. Eborn, and she encouraged Ms. Eborn's drug use.  *Id.*, PSR ¶ 70.  Mr. Jean and his younger sister, Pearlie Jean, witnessed this violence and the associated substance abuse, and they supported each other by huddling and crying together.  Dr. Hamlett Decl. ¶ 18 (Ex. A).

In an attempt to protect Mr. Jean from Ms. Eborn's drug abuse, Mr. Jean's father would occasionally take young Mr. Jean into his home in Norwalk, where he lived with his wife, Mary Desances.  *Id.* ¶¶ 71-72.  While this separated Mr. Jean

---

[1] Dr. Hamlett is a psychologist who evaluated Mr. Jean in 2019.  As detailed in Dr. Hamlett's declaration, Kelly Barrett, Esq., Mr. Jean's attorney at the Federal Defenders of Connecticut, retained Dr. Hamlett to conduct psychological testing relating to Mr. Jean's cognitive, behavioral, and adaptive functioning.

The Honorable Cathy Seibel                                    Page **3** of **23**
United States v. Jacques Jean (22 Cr. 117)    Sentencing Submission (April 24, 2023)

from his mother's substance abuse, it exposed Mr. Jean to prolonged abandonment and physical abuse. Mr. Jean Sr. worked two jobs, and gambled at night, so he was rarely home. Dr. Hamlett Decl. ¶ 21 (Ex. A). Mr. Jean recalls only seeing his father one or two times each week. PSR ¶ 70, Dr. Hamlett Decl. ¶ 22. Mr. Jean had more frequent contact with Ms. Desances, but this was also very limited and mainly occurred on the days that Ms. Desances made Mr. Jean dinner. PSR ¶ 71, Dr. Hamlett Decl. ¶¶ 20-21 (Ex. A). On those days, Ms. Desances would prepare Mr. Jean's meal and then retreat to her bedroom, leaving Mr. Jean alone to eat his dinner. Dr. Hamlett Decl. ¶ 20 (Ex. A).[2]

While Mr. Jean's father was largely absent, he'd appear whenever Mr. Jean got in trouble. *Id.*, ¶ 22. On these occasions, Mr. Jean would be subjected to extreme physical abuse. PSR ¶ 71, Dr. Hamlett Decl. ¶ 22 (Ex. A). On some occasions, Mr. Jean would be "whipped," on others, he'd be forced to kneel on rice while his father hit him with a belt. *Id.*

Mr. Jean lived with his father for a number of years while he was in elementary school and in the sixth grade. PSR ¶ 72-73. But then the school decided that Mr. Jean would need to repeat the sixth grade, which troubled Mr. Jean greatly. *Id.* ¶ 73. Dr. Hamlett Decl, ¶¶ 28-29 (Ex. A). Mr. Jean thought about suicide but instead ran away to his mother's home in Bridgeport. *Id.* Mr. Jean's father "gave up" and subsequently broke off communication with Mr. Jean. *Id.*

Ms. Eborn was still using drugs when Mr. Jean returned to her home. PSI ¶ 74. Mr. Jean was therefore re-exposed to drugs, and – not surprisingly given his desperate situation – Mr. Jean started to experiment himself. He started with marijuana, but his drug use eventually escalated to include Percocet, phencyclidine, ecstasy and extreme amounts of alcohol. PSR ¶ 100, Dr. Hamlett Decl. ¶ 50 (Ex. A). The family was eventually evicted, which resulted in years of housing instability for Mr. Jean, who at this point was a young teenager. PSR ¶ 76, Dr. Hamlett Decl, ¶ 36 (Ex A). At times, the family would stay with Ms. Eborn's parents, but that arrangement soon ended, forcing Mr. Jean to live with friends, on the street, or with Donna Neff, a woman Mr. Jean met while playing basketball. PSR ¶ 74, 77, Dr. Hamlett Decl, ¶ 37 (Ex A).

In addition to familial violence inside his various homes, Mr. Jean was also frequently exposed to violence in the streets. Around the time that Mr. Jean ran away from his father's home, Bridgeport was experiencing a huge spike in drug-related killings, prompting the state to utilize state troopers to patrol the streets to

---

[2] On days that Ms. Desances worked a double shift, which was often, Ms. Desances would leave food for Mr. Jean to heat by himself after school. Dr. Hamlett Decl. ¶ 20 (Ex. A).

help quell the violence.[3]  When he was in the 9th Grade, one of Mr. Jean's friends was shot and killed.  Dr. Hamlett Decl. ¶ 51 (Ex. A).  Mr. Jean was also subject to violence: he was repeatedly attacked, both on the street and at school.  *Id.* ¶¶ 53-54.  Then at seventeen, another close friend was murdered.  *Id.*

In describing his childhood environment, Mr. Jean reported to Probation,

> My neighborhood was bad.  People getting shot, getting
> killed, doing drugs, selling drugs, beefing with rivals and
> stuff like that.  There was a generation before me that
> was beefing with another part of town.  It became a food
> chain.  That carried up to the older generation.  It just
> didn't stop.  It just got worse and worse.  I could walk out
> of my house, every day, and didn't know if I would make it
> back.  I didn't care.  I wasn't scared to die.  The only
> person I feared was God.  I was out there smoking,
> drinking, doing stuff that a young teenager shouldn't be
> doing.  PSR ¶ 75.

Mr. Jean never acted violently, but at his mother's home in Bridgeport Mr. Jean was introduced to – and eventually participated in – the drug trade.  Dr. Hamlett Decl. ¶ 143.  This occurred when Mr. Jean's sister began dating a drug dealer who then moved into Ms. Eborn's home.  PSR ¶ 70, Dr. Hamlett Decl. ¶¶ 32-33, 143.  The presence of a professional drug dealer had one significant advantage for Mr. Jean: the drug dealer kept the kitchen fully stocked and provided Mr. Jean with clothing and footwear, which meant that Mr. Jean no longer had to beg others for food.  Dr. Hamlett Decl. ¶ 39, 143 (Ex. A).

B.  <u>Academic Struggles</u>

Academically, Mr. Jean was never had a chance.  In kindergarten, his teacher noted that he "has not made the progress expected for this grade" and in 3rd grade he failed math and was criticized for not participating in Art class.  *Id.*, ¶ 26 .  In the 5th grade, it was noted that Mr. Jean was "not ready for grade 6."  *Id.*  But he was advanced nonetheless.  *Id.*  Then in the 6th grade, Mr. Jean failed nine out of eleven classes and received the lowest score (zero) on state examinations for Reading Comprehension, Listening Comprehension and Written Comprehension.  *Id.* ¶ 42.  Not surprisingly, Mr. Jean was utterly unprepared for high school.  Mr. Jean did not complete the 9th grade and when he, by switching schools, made it to the 10th grade Mr. Jean received failing grades except for Geometry and English, where he received a D+ and D.  *Id.* ¶ 45-48.  Mr. Jean's 9th grade basketball coach recalls that, even while playing basketball, it was clear that Mr. Jean could not

---

[3] Merrill Goozner, *Battling Inner City Violence,* Chic. Tib., Oct. 10, 1996, *https://www.chicagotribune.com/news/ct-xpm-1996-10-10-9610100250-story.html* (last assessed April 21, 2023).

Case 7:22-cr-00117-CS    Document 51    Filed 04/24/23    Page 6 of 24

The Honorable Cathy Seibel                                    Page **5** of **23**
United States v. Jacques Jean (22 Cr. 117)        Sentencing Submission (April 24, 2023)

comprehend instructions.  *Id.* ¶ 47.  Despite his prolonged (and seemingly obvious) academic struggles, Mr. Jean was never screened for a learning or intellectual disability.  *Id.* ¶ 49.

### C. Basketball and Notre Dame High School

While Mr. Jean lived at his father's house, he discovered a love and knack for basketball.  He spent hours each day practicing, in part because he was left alone at his father's house each day.  PSR ¶ 71. Mr. Jean excelled at basketball and when he was twelve, after he had run away from his father's house and was back living with his mother, Donna Neff discovered Mr. Jean at the neighborhood basketball court.  PSR ¶ 77.  Ms. Neff was impressed by Mr. Jean's basketball skills and recognized that Mr. Jean was in desperate need for help.  Ms. Neff quickly became a mother-figure for young Mr. Jean.  Dr. Hamlett Decl. ¶ 34 (Ex. A).  She wanted to change Mr. Jean's environment, so she told Mr. Jean about Notre Dame High School, a private school in Fairfield, Connecticut, where Mr. Jean could benefit from a better school and get to play basketball.  *Id.* ¶ 34-35, With the assistance of Ms. Neff, Mr. Jean obtained a scholarship to attend Notre Dame as a freshman.  *Id.*  During this time, Mr. Jean's mother did not have a stable home, so Mr. Jean had to fend for himself to find a place to sleep.  PSR ¶ 77, Dr. Hamlett Decl. ¶ 37 (Ex. A).  Mr. Jean often stayed with Ms. Neff, and for four or five months he stayed at a classmate's home.  Dr. Hamlett Decl. ¶ 36-37 (Ex. A).  This arrangement was complicated, as Mr. Jean's friend did not tell his parents that Mr. Jean needed a place to live, so Mr. Jean was forced to hide in his friend's closet so that the friend's parents would not learn of Mr. Jean's desperate situation.  *Id.*

Despite his housing instability, Mr. Jean loved his time at Notre Dame.  He was only a freshman, but he was placed on their varsity basketball team.  PSR ¶ 77. Ms. Neff provided tremendous support, attending Mr. Jean's basketball games, providing him with food, and purchasing him badly needed clothing.  *Id.*, Dr. Hamlett Decl. ¶ 38.  Mr. Jean cherishes his time at Notre Dame, calling it the "best year" of his life.  Dr. Hamlett Decl. ¶ 37 (Ex. A).  Sadly, Notre Dame was not to be.  Mr. Jean failed nearly all his classes and finished the 9th grade with the lowest GPA of all the 201 freshmen at the school.  Dr. Hamlett Decl. ¶ 45.

### D. Childhood Homelessness and Substance Abuse

After Notre Damne, Mr. Jean returned to Bridgeport, was promoted to the 10th grade, and attended Bassick High School before dropping out in the 11th grade.  Dr. Hamlett Decl. ¶¶ 45, 48 (Ex. A).  During this time, Mr. Jean was mostly homeless.  Ms. Neff's son recalls that Mr. Jean "was pretty much living in a trash bag" and that he "would literally have to find food" to eat.  Dr. Hamlett Decl. ¶¶ 39-40 (Ex. A).  During this desperate time, Mr. Jean's drug and alcohol use escalated.  PSR ¶ 100, Dr. Hamlett Decl. ¶¶ 51-52, 56, 62 (Ex. A).  Mr. Jean regularly used PCP, smoked marijuana daily, and eventually began consuming a bottle of liquor a day.  *Id.*  Mr. Jean was close to, and sometimes lived with, his sister's boyfriend,

who dealt drugs and provided financial assistance to the family.  The neighborhood dealers drove nice cars and Mr. Jean quickly learned that, by selling drugs, he could escape his desperation, fuel his addiction, and have food to eat.  Dr. Hamlett Decl. ¶ 143 (Ex. A).

## Mr. Jean's Adult Years

A. <u>Substance Abuse, Related Arrests and Continued Trauma</u>

In 2004, and less than one-year after dropping out of school, Mr. Jean was arrested for selling drugs.  PSR ¶ 50, Dr. Hamlett Decl. ¶ 57.  Mr. Jean, eighteen years old, pleaded guilty and served roughly twelve months in prison.[4]  PSR ¶ 50. After serving his time, Mr. Jean returned to his mother's home.  *Id.*  Mr. Jean, still addicted to drugs, continued using, and dealing, drugs.  This pattern continued throughout Mr. Jean's late teens and adult years, resulting in five drug related convictions and sentences.  PSR ¶50-57.[5]  The longest sentence Mr. Jean served was a two and ½ year term between 2013 and 2016.[6]  PSR ¶ 56.

Following his state sentences, Mr. Jean would occasionally be referred to drug treatment programs to combat his profound addiction.  PSR ¶ 102.  For instance, in 2010, Mr. Jean was evaluated by Connecticut Renaissance and referred to an outpatient group that focused on substance abuse and trauma.  Dr. Hamlett Decl. ¶ 68 (Ex. A).  Mr. Jean's attendance was sporadic, and he was discharged with a recommendation that he needed a higher degree of care.  *Id.*  Mr. Jean did not receive more intensive treatment.  *Id.*

As a young adult, Mr. Jean continued to experience violence in his community.  A nephew was murdered when Mr. Jean was in state custody and then, at twenty, a close friend was killed in a shooting in Mr. Jean's neighborhood. *Id.* ¶ 55, 59 (Ex. A).  A few years later, Mr. Jean was targeted – during an argument, Mr. Jean was shot at sixteen times, but thankfully only one bullet hit him (in his leg).  PSR ¶ 90, Dr. Stanton Decl. ¶ 62 (Ex. A).  Mr. Jean was hospitalized and prescribed Percocet for the pain, which only exacerbated Mr. Jean's substance abuse problems.  Dr. Hamlett Decl. ¶ 62 (Ex. A).

---

[4] Mr. Jean was sentenced to two years, but Probation notes that he was only in custody from November 10, 2004 to November 30, 2005 (12.6 months).  PSR ¶ 50.

[5] Mr. Jean also has one theft-related conviction from 2004 and one misdemeanor assault conviction from 2012.  PSR ¶¶ 52, 55.

[6] Mr. Jean was sentenced to 10 years, with 5 years suspended, but Probation indicates that Mr. Jean only was in custody from November 8, 2013 to June 20, 2016 (31.4 months).  PSR ¶ 56.

The Honorable Cathy Seibel                                    Page **7** of **23**
United States v. Jacques Jean (22 Cr. 117)        Sentencing Submission (April 24, 2023)

### B.  Mr. Jean Finally Gets Treatment

Mr. Jean finally received more comprehensive drug treatment in 2018.  This followed Mr. Jean's federal arrest in March, 2018 for selling drugs in Connecticut. PSR ¶ 57.  After serving a few months in jail,[7] on June 4, 2018, Mr. Jean was released to the APT Foundation, a residential substance abuse program in New Haven.  Dr. Hamlett Decl. ¶ 71 (Ex. A).  Mr. Jean excelled at the APT Foundation. He had no positive drug screens and was successfully discharged in September 2018.  *Id.*  Mr. Jean next participated in extensive outpatient treatment through Connect Renaissance, and he joined the District of Connecticut's Support Court program in October, 2018.  PSR ¶¶ 57, 104, Support Court Status Report ("Supp. Ct. Status Rep.") (Ex. B).  Again, Mr. Jean excelled.  Mr. Jean refrained from using drugs,[8] received treatment services from Connecticut Renaissance, and found steady employment. Supp. Ct. Status Rpt. (Ex. B).  Mr. Jean successfully graduated from Support Court on February 19, 2020.  PSR ¶ 57, Supp. Ct. Status Rpt. (Ex. B). At Mr. Jean's graduation, the judge overseeing the program remarked Mr. Jean had shown "tremendous determination and reliability."  PSR ¶ 57.

Despite his accomplishments at Support Court, Mr. Jean faced one sad when, in an attempted to obtain his GED, Mr. Jean sought admission into a GED program.  Reminiscent of Mr. Jean's childhood academic struggles, Mr. Jean failed the GED program's admission test, so he was unable to enroll in the GED program. Supp. Ct. Status Rep. (Ex. B).  Thanks to the resources of Mr. Jean's tremendous legal team at the Connecticut Federal Defenders, Mr. Jean was evaluated by Nakia Hamlett, M.Ed., Ph.D., a psychologist with expertise in cognitive and learning disabilities.  Dr. Hamlett Decl. (Ex. A).  The results were dramatic:  not only did Mr. Jean suffer from PTSD due to his years of trauma and neglect, he also was diagnosed with a significant and previously undiagnosed intellectual disability.  *Id.* As detailed by Dr. Hamlett, "Mr. Jean obtained a Full-Scale IQ of 65, which is in the Extremely Low range of intellectual functioning."  Dr. Hamlett Decl. ¶ 97 (Ex. A).

Mr. Jean's intellectual disability explains why tasks that seem simple to others, such as following a basketball coach's instructions or following the instructions on the back of a microwavable Hot Pocket, were so difficult for Mr. Jean.  *See* Dr. Hamlett Decl, ¶ 33 ("Ms. Lemy described how Mr. Jean could not make simple meals for himself, such as following the instructions to microwave a

---

[7] The PSR does not indicate how much time Mr. Jean served in relation to this case, but it appears that Mr. Jean served roughly three months.  *See* 18 Cr 153, Dkt Entry # 8 and 15, Dr. Hamlett Decl. ¶ 71.

[8] As detailed in the Support Court Status Report, Mr. Jean did self-disclose alcohol use after he used alcohol on one occasion, but otherwise "Mr. Jean had no other issues with substances, as he was drug tested randomly by the U.S. Probation Office, all test resulting in negative for substances."  Supp. Ct. Status Rep. (Ex. B).

Case 7:22-cr-00117-CS   Document 51   Filed 04/24/23   Page 9 of 24

The Honorable Cathy Seibel                              Page **8** of **23**
United States v. Jacques Jean (22 Cr. 117)        Sentencing Submission (April 24, 2023)

Hot Pocket") (Ex. A).  These cognitive limitations, similarly, explain why it has been so challenging for Mr. Jean to maintain steady employment.  *Id.*, ¶ 65.  Mr. Jean has repeatedly been fired due to performance-related issues at work.  PSR ¶ 110, 112, 116, 119.  In February, 2019, Mr. Jean lost a job at a recycling facility for poor performance and in April, 2019, after only one week of employment, Mr. Jean lost a job at Dunkin Donuts because he could not keep up with the workflow.  PSR ¶¶ 116, 119.  Then in  October, 2020, Mr. Jean lost a job deconstructing mattresses because of his slow pace, and in December, 2021, Mr. Jean was terminated from a job at a warehouse because he was not sufficiently efficient.  PSR ¶ 110, 112.  Similarly, Mr. Jean has repeatedly been told that his cognitive limitations make vocational training unavailable to him.  In the summer and fall of 2021, Mr. Jean twice failed the admission test for a CDL course, even though he had been given extra time to complete the test, and in September, 2021, an employment assistance agency told Mr. Jean that due to "specific barriers that Mr. Jean faces," the agency could not find him a job.  Dr. Thomas Declaration, ¶ 41 ("Dr. Thomas Decl.") (Ex. C).[9]

Nevertheless, Mr. Jean does have a strong work ethic and has proven that, with the right job, he can maintain steady employment.  Between February, 2019 and June, 2020, Mr. Jean worked full-time as a flagger for American Flagging and Traffic Control.  PSR ¶ 113, Dr. Thomas Decl, ¶ 41 (Ex. C).  Flagging was the perfect job for Mr. Jean because its consistency, predictability and structure aligns well with Mr. Jean's cognitive deficits and strengths.  Dr. Hamlett Decl ¶ 66, 150.  Thus, having finally found a job that suited his skills, Mr. Jean excelled at work.  His supervisor explained,

> From the day he began working with AFTC, I have been able to rely on Mr. Jean to arrive early and stay late. . .
>
> Mr. Jean has demonstrated an excellent attitude during his entire tenure at AFTC.  I have witnessed his humility, respectfulness, and diligence at all junctures.  He does not proffer excuses nor complaints.  Mr. Jean is ready to work and consistently punctual, if not early.  On the one occasion where Mr. Jean was delayed by fifteen minutes, he notified both myself and his Supervisor well ahead of time.  The only time he has ever asked for a day off has been to attend court or to care for one of his sick children.  Notably, I have never had a complaint about Mr. Jean.  This is significant as he is one of the only flaggers for

---

[9] Dr. Thomas, a psychologist, was asked to evaluate Mr. Jean following Mr. Jean's arrest in this case.  As detailed in Dr. Thomas' declaration, I asked Dr. Thomas to evaluate how Mr. Jean's intellectual disability and history of trauma impacted Mr. Jean's functioning in late 2020 through December, 2021, and to create a treatment plan to address Mr. Jean's cognitive limitations and his history of trauma.

> whom I can say that.  If all of my employees could work as
> Mr. Jean works, I would be thrilled.

PSR ¶ 113.

### C. Mr. Jean's Strong Familial Ties

Mr. Jean has a profound devotion to his family.  While he clearly has reason to be upset with his mother, he is devoted to her.  PSR ¶ 69.  He also has strong bonds with his three children and their mothers.  Mr. Jean's oldest child, █████ ████████████████████████, lives in Bridgeport with her mother, Jessenia Rios. PSR ¶ 81-82.  Mr. Jean and Ms. Rios dated in 2011 and 2012 and Mr. Jean remains active in ████ life.  As detailed by Probation, Mr. Jean is proud to have been involved in a recent ████████████ ██ ████████████ ████████████████████.  *Id.*  Mr. Jean's middle child, ███████████████████████████, lives in Derby, Connecticut with his mother, Gloria Tavaras.  PSR ¶ 79.  Ms. Tavaras and Mr. Jean were romantic partners from 2011 through 2020 and remain close today, which allows Mr. Jean to have regular contact with his ███.  PSR ¶ 80. Mr. Jean's youngest child, ████████████████, was born on ██████████.  PSR ¶ 84. ██████ mother, Stacey Lemy, began dating Mr. Jean in 2020.  PSR ¶ 83.  Mr. Jean remains close to Ms. Lemy.  *Id* at 84.

Mr. Jean loves his children and constantly strives to help them.  He told Probation, "My relationship with my kids is magnificent.  I go all-out for my kids. . . I want to be the best parent that I can.  My job is to make sure my kids don't go through anything that I did."  PSR ¶ 85.  This sentiment is confirmed by Probation Officer Randie Q. Phillips, who explained in a memorandum to Connecticut's Support Court, that

> Mr. Jean's responsibility as a father transcends other
> interests in his life.  He is dedicated to creating
> opportunities and a future for his children he was not
> afforded while growing up.  Mr. Jean expressed wanting
> to be a valuable asset to his community, which starts with
> him being an anchor, encourager, and role model for his
> children.  Mr. Jean takes pride in being a father to his
> two children; ██████████████████████ and ██████████
> ███.  Mr. Jean continues to play an active role in their
> lives.

Supp. Ct. Status Rep. (Ex. B). [10]

---

[10] This report was written in March, 2020, prior to the birth of Mr. Jean's third child.  While the first page of the report is dated April 22, 2023, the third page makes it clear that the letter was written on March 11, 2020.  Supp. Ct. Status Rep. (Ex. B).

D. <u>Continued Trauma, Unemployment and Relapse</u>

Mr. Jean felt pride when he was able to work and provide for his family, which is why he excelled while working as a flagger from January, 2019 through June, 2020. PSR ¶ 113. Mr. Jean lost this job due to the COVID-19 pandemic and, because of Mr. Jean's intellectual disability, he could not maintain steady employment thereafter. PSR ¶¶ 110-112, Dr. Thomas Decl. ¶ 41 (Ex. C).[11] Months after losing this job, and during the ongoing turmoil of the COVID-19 pandemic, Mr. Jean learned that Ms. Lamy was pregnant and then in December, 2020, Mr. Jean's cousin was murdered. PSR ¶ 95, . During this time period, Mr. Jean was living with Ms. Lamy, who was essentially providing Mr. Jean with the structure and support that his intellectual disability requires. Dr. Thomas Decl, ¶ 33. Despite having this support, Mr. Jean could not cope with the death of his cousin. Ms. Lemy explains, "he changed completely," became paranoid, fearful and angry, "that's when he started drinking." Dr. Thomas Decl. ¶ 23. Mr. Jean's mother, Ms. Ebron, adds, "He acted like he didn't care about a lot of things after that. He gave up all hope." Dr. Thomas Decl, ¶ 25.

Suddenly, the achievements Mr. Jean achieved through Support Court had vanished. Dr. Thomas explains,

> The murder of Mr. Jean's cousin led to a sharp increase in his PTSD and grief symptoms. Mr. Jean felt that he was "guilty by association," due to his close relationship with his cousin, and he feared he had a target on his back. He began driving other people's cars due to fear of being shot, and he became fearful that his family was also at risk of being harmed. He began having constant intrusive thoughts about his cousin, which have continued to this day. Mr. Jean's mother and girlfriend both witnessed his trauma symptoms increase, to the point that he became "paranoid" and "a different person." To cope with his worsening PTSD and grief symptoms, Mr. Jean began drinking and using substances despite a strong desire to stay sober. Mr. Jean lacked adaptive coping mechanism and felt that substances were his only way of temporarily escaping his intense grief and PTSD symptoms.

---

[11] The PSR incorrectly states that Mr. Jean was employed as a driver for nine months between October, 2020 and July, 2021. PSR ¶ 111. In reality, Mr. Jean was only able to maintain this job for two months (August and September of 2021). Dr. Thomas Decl. ¶ 41 (Ex. C).

The Honorable Cathy Seibel
United States v. Jacques Jean (22 Cr. 117)

Page **11** of **23**
Sentencing Submission (April 24, 2023)

Dr. Thomas Decl. ¶ 38 (Ex. C).

E. Mr. Jean's Offense

After he relapsed, Mr. Jean was unable to maintain employment, which only exasperated his stress and anxiety. Knowing that he had a child on the way, Mr. Jean was desperate. It was during this time of extreme vulnerability that Mr. Jean was introduced to an undercover officer who offered Mr. Jean money for drugs. On May 26, 2021, Mr. Jean sold one "corner tie" of cocaine to this officer for $300. PSR ¶ 15.[12] Two months later, the undercover asked for more drugs, and, on two dates in July, 2021, Mr. Jean sold $340 and $500 worth of drugs that contained fentanyl to the same undercover officer. PSR ¶ 16-17. At this point, the undercover asked for more and more drugs, leading to a $1,300 transaction on August 5, 2021 and a $1,400 sale on September 2, 2021. PSR ¶ 18-19. Then in late October, the officer offered Mr. Jean $1,400 if Mr. Jean could get him a handgun. Mr. Jean complied and sold the undercover a gun. Between October 31, 2021, and December 9, 2021, Mr. Jean received $15,000 from this undercover relating to four transactions involving four guns and narcotics.[13] PSR ¶ 20-25.

Mr. Jean was arrested on December 9, 2021 and has been detained continuously thereafter at the Westchester County Jail. While incarcerated, Mr. Jean completed the "Know Better, Liver Better" program and applied to the "Solutions" program but was not accepted. PSR ¶ 11. Mr. Jean has had no disciplinary infractions and secured employment in the jail's laundry room. PSR ¶¶ 11, 109.

### ***Mr. Jean Is Not a Career Offender***

As Your Honor is well aware, a state conviction under a statute that criminalizes the trafficking of substances that are not federally proscribed cannot constitute a controlled substance offense under federal law. As detailed in the attached memorandum of law, Mr. Jean does not qualify as a career offender because his state convictions under Connecticut General Statutes ("C.G.S.") § 21a-277(a) encompass conduct, specifically the trafficking of naloxogel, ioflupane, and certain cocaine isomers, that is not federally prohibited. Memorandum of Law (Exhibit D). Thus, as Your Honor ruled in *United States v. Almonte,* 21 Cr. 566 and *United States v. Augustine,* 17 Cr. 753,[14] Mr. Jean's state convictions do not

---

[12] The amount of money exchanged for some of these transactions is not referenced in the PSR. This was learned from discovery labeled USAO_000028 through USAO_000032.

[13] The final transaction on December 9, 2021 also involved Mr. Jean's co-defendant. PSR ¶¶ 24-26.

[14] *Almonte* and *Augustine* did not involve an analysis as to ioflupane.

constitute controlled substance offenses and Mr. Jean, therefore, does not qualify as a career offender.

### *The Most Appropriate Sentence:  Sixty Months*

As Your Honor is well aware, in selecting a sentence this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). That provision directs sentencing courts to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," i.e., "proportionality, deterrence, incapacitation, and rehabilitation." *Id*. In *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), the Second Circuit explained that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, **it must choose the lower sentence**. *See id*. at 142 (observing that where a guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence).

In this case, and as recognized by Probation, Mr. Jean is worthy of a significant variance.  Mr. Jean grew up in extreme poverty and surrounded by substance abuse, violence and neglect.  Mr. Jean is not violent, is devoted to his family, and his conduct in this case is undoubtedly linked to his trauma, substance abuse and intellectual disability.  Under these circumstances, a sentence of more than five-years would be significantly "greater than necessary."

A.      The Nature and Circumstances of Mr. Jean's Conduct do Not Compel a Lengthy Sentence.

As a child, Mr. Jean was often homeless and in desperate need for nourishment.  A childhood acquittance recalls that Mr. Jean "would literally have to find food" and that when Mr. Jean would eat at a homecooked meal at the acquittance's home, Mr. Jean would devour food "as if he had never eaten before." Dr. Hamlett Decl. ¶ 39 (Ex. A).  Then, Mr. Jean's sister began dating a drug dealer and suddenly Mr. Jean had access to food and clothing.  *Id.* ¶ 143.  Soon thereafter, and with the help of that boyfriend, Mr. Jean began supporting himself, and his family, by selling drugs.  *Id.*  He also developed his own drug habit, which he used to help numb the pain of years of extreme and untreated trauma.

In this context, Mr. Jean's offense conduct is understandable.  Mr. Jean had found sobriety in 2018, but then he relapsed in 2020 after his life had destabilized. Between 2018 and early 2020, Mr. Jean had a highly structured life.  PSR ¶ 103. He was first in an intensive inpatient drug program at the APT Foundation, and then he enrolled in intensive outpatient programs at Connecticut Renaissance.  *Id.* ¶ 104. Mr. Jean next participated in the Bridgeport Support Court program, wherein Mr. Jean found sustained sobriety and sustainable employment (flagging). Supp. Ct. Status Rep. (Ex. B).  Support Court also provided structure to Mr. Jean's life: he attended regular therapy sessions and weekly sessions at the court.  Dr. Hamlett Decl. ¶ 160 (Ex. A).  Mr. Jean graduated from Support Court in February

The Honorable Cathy Seibel                                    Page **13** of **23**
United States v. Jacques Jean (22 Cr. 117)       Sentencing Submission (April 24, 2023)

of 2020. *Id.* This marked the end of roughly twenty-months of structured treatment and support.

Unfortunately, months later Mr. Jean's life would unravel. Because of COVID-19, the world shut down, support became unavailable, and Mr. Jean lost his job as a flagger. Mr. Jean's cousin was then murdered, and Mr. Jean learned that his girlfriend was pregnant. "The murder of Mr. Jean's cousin led to a sharp increase in his PTSD and grief symptoms. . . . He began having constant intrusive thoughts about his cousin, which have continued to this day." Dr. Thomas Decl. ¶ 38 (Ex. C). Mr. Jean responded by self-medicating with drugs and alcohol, which, when combined with the financial necessities related to having a child on the way, caused Mr. Jean to experience more financial stress and personal desperation. It is in this context that an undercover officer offered Mr. Jean an opportunity to make easy money.

Of course, Mr. Jean should not have sold drugs and guns. But given Mr. Jean's past, his actions are understandable. As a boy, Mr. Jean had learned that selling drugs would literally put food on the table, so it is not surprising that – during this time of extreme desperation and need – Mr. Jean resorted to dealing. But Mr. Jean's crimes were not designed to get rich or to hurt others. Instead, they were products of desperation, drug dependency, mental illness and financial need. Because of this, a five year-sentence is more than sufficient.

B.    Mr. Jean's History and Characteristics Justify Leniency.

As recognized by Probation, Mr. Jean's history and characteristics call for a significant variance. PSR P. 41-43. Specifically, Mr. Jean's lifelong, debilitating intellectual disability renders him "categorically less culpable than the average criminal." *Atkins v. Virginia,* 356 U.S. 304, 316 (2002). And his years of trauma – which has yet to be treated – are relevant because Mr. Jean's only known mechanism to treat his PTSD is to use substances, which has contributed to his (nonviolent) criminal activity.

The Second Circuit has held that there are "certain situations where a person's mental and emotional conditions may be taken into account" in imposing a reduced sentence. *United States v. Brady*, 417 F.3d 326, 333 (2d Cir. 2005). For example, the Sentencing Guidelines recognize that a defendant's diminished mental capacity or significant mental or emotional conditions may warrant a reduced sentence. *See* U.S.S.G. §§ 5K2.13, 5H1.3. In the pre-*Booker* framework, such considerations were accounted for by way of a downward departure under the Sentencing Guidelines. *See United States v. Silleg*, 311 F.3d 557, 562 (2d Cir. 2002) (quoting *United States v. Rivera*, 994 F.2d 942, 948 (1st Cir. 1993) ("The individual guidelines do not take account, for example, of an offender's 'diminished capacity,' which circumstance, in the Commission's view would normally warrant a downward departure.")).

Although "[t]he concept of departures has been rendered obsolete in post-*Booker* sentencing," and the defense (adhering to the terms of the plea agreement) does not seek a departure in this case, "the district court may apply [the] departure guidelines by way of analogy in analyzing the section 3553(a) factors." *United States v. Miranda*, 505 F.3d 785, 792 (7th Cir. 2007); *see, e.g.*, *United States v. Anderson*, 547 F.3d 831, 833 (7th Cir. 2008) ("But now that the sentencing guidelines are merely advisory, a judge can give a sentencing discount to [a defendant] pursuant to 18 U.S.C. § 3553(a) on account of diminished capacity, without regard to the limitations in guideline section 5K2.13, because diminished capacity might affect the nature and circumstances of the offense and the history and characteristics of the defendant, and those are among the statutory factors that guide sentencing."); *United States v. Pallowick*, 364 F. Supp. 2d 923, 927 (E.D. Wisc. 2005) (considering mental illness and cases applying U.S.S.G. § 5K2.13 not for purposes of a departure, but by analogy for applying the section 3553(a) factors).

The point of such a departure or variance "it to treat with lenity those individuals whose 'reduced mental capacity' contributed to commission of a crime." *United States v. Chatman*, 986 F. 2d 1446, 1452 (D.C. Cir. 1993). Such lenity is appropriate because "two of the primary rationales for punishing an individual by incarceration—desert and deterrence—lose some of their relevance when applied to those with reduced mental capacity." *Id.*

"As to desert, persons who find it difficult to control their conduct do not—considerations of dangerousness to one side—deserve as much punishment as those who act maliciously or for gain." *Id.* (quotations omitted). As Judge Posner recognized, "whatever the prognosis of a mental illness, a person who acts under the effect of diseases is not as evil, as worthy therefore of punishment, as one who would not be law abiding even if he were not mentally impaired." *United States v. Dyer*, 216 F.3d 568, 571 (7th Cir. 2000); *see Miranda*, 505 F.3d at 793–94.

In addition, "mental illness . . . might make it more difficult for a person to comply with the law, and so a heavy sentence would not have a significant deterrent effect on persons in the defendant's class." *Miranda*, 505 F. 3d at 793; *see Chatman*, 986 F.2d at 1452 ("Because legal sanctions are less effective with persons suffering from mental abnormalities, a system of punishment based on deterrence also curtails its sanction." (quotations omitted)).

Applying these principles, courts nationwide have repeatedly recognized that well-documented mental health conditions justify leniency either through a downward departures and, in the post-*Booker* framework, with a variances. *See United States v. Glick*, 946 F.2d 335, 339 (4th Cir. 1991) ("The psychiatrist testified without contradiction that . . . the disorder from which [the defendant] suffered impaired his ability to cope with stress so that 'this led him to act out in this self

destructive fashion.' We find no abuse of discretion in the determination by the district court that sentence below the applicable guidelines range should result because of [the defendant's] diminished capacity."); *Pallowick*, 364 F. Supp. 2d at 928 ("[C]ourts regularly have held that depression and anxiety may cause a substantially reduced mental capacity, supporting mitigation of punishment for a crime.)".

Turing to Mr. Jean's conduct, his decision to participate in criminal activity in 2021 is undoubtedly linked to his intellectual disability and untreated PTSD. Mr. Jean's financial desperation in 2021 was a product of his intellectual disability, which had made it impossible for Mr. Jean to keep a job. Dr. Thomas Decl. ¶ 41 (Ex. B). And Mr. Jean's relapse was triggered by his untreated PTSD, for which Mr. Jean had never been effectively treated. *Id.*, ¶ 38. Dr. Thomas explains that in late 2020 and 2021,

> Mr. Jean's intellectual disability and untreated PTSD and grief all contributed to challenges with goal-oriented problem solving. Intellectual impairments often lead to challenges with problem solving, as creative problem solving involves a high level of cognitive demand. People with IDs often feel like they have limited choices, since their intellectual impairment is a barrier to solving problems in an adaptive, goal-oriented way. Additionally, his untreated PTSD led to severe emotional dysregulation, chronic dissociation, and heightened emotional reactions, which further exacerbated Mr. Jean's challenges with goal-oriented problem solving.
>
> Dr. Thomas Decl. ¶ 39 (Ex. C).

While Mr. Jean can learn to control his behavior through appropriate support and treatment (see § F, *infra*), when evaluating a proper sentence in this case it is relevant that Mr. Jean's decision to resort to criminal activity in 2021 occurred when, due to the confluence of his unique mental health diagnosis and cognitive limitations, Mr. Jean's ability to problem solve, think critically and control his impulses was severely limited. This is relevant and justifies a significant variance. *See, e.g., United States v. Cantu*, 12 F.3d 1506, 1513, 1516-1517 (9th Cir. 1993) (ordering a new sentencing hearing because the sentencing court erroneously believed that the defendant's post-traumatic stress disorder could not constitute "significantly reduced mental capacity for the purposes of § 5K2.13"); *United States v. Varsanyi*, 2021 WL 603071, 1 (SDNY 2021) (explaining that the court imposed a below-guidelines sentence because of the defendant's "extremely difficult upbringing, his history of anxiety, depression, and post-traumatic stress disorder ('PTSD')"); *United States v. Gonzalez,* 2004 WL 230992, 5 (SDNY 2004) ("While PTSD on its own would be insufficient to affect a defendant's development

sufficiently to merit a departure, in Gonzalez's case the effects of PTSD were compounded by 'parental abandonment and neglect'); *United States v. Allen,* 250 F.Supp 2d 317, 322 (SDNY 2003) ("Given this confluence of personality defects, coupled with defendant's borderline intellectual functioning, it becomes apparent that defendant has real mental and emotional deficits. . . . An eight-level departure takes into account this defendant's unique personality characteristics while still reflecting the seriousness of his offense").

To be clear, consistent with the plea agreement, Mr. Jean does not seek a departure based on diminished mental capacity or his mental and emotional health issues that are present to an unusual degree. *See* USSG §§ 5K2.13, 5H1.3. Nor is it Mr. Jean position that he did not know that his actions were wrong. But, in light of Mr. Jean's well documented mental illnesses and his significant cognitive limitations, Mr. Jean's ability to *control* his behavior was significantly impaired during his moments of crisis and instability when his crimes occurred, rendering his conduct less culpable under § 3553(a)(1). As recognized by Probation, this justifies a significant variance.

C.    A Five Year Sentence Provides Ample Deterrence.

Regarding specific deterrence, courts have frequently recognized that when imposing a sentence the sentencing court should consider the prior sentences that a defendant has received. *See United States v. Mishoe*, 241 F.3d 214, 219-220 (2d Cir. 2001); *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser prison term is sufficient to deter one who has not been subject to prior lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend."). Here, while Mr. Jean has several prior convictions, a five-year sentence will far surpass any custodial sentence Mr. Jean has previously received. The longest period of incarceration that Mr. Jean has served occurred between 2013 and 2016, when Mr. Jean served roughly two and one-half years for a Connecticut drug sale.[15] PSR ¶ 56. Thus, a five-year sentence would amount to a sentence that is *double* the amount of incarceration that Mr. Jean has previously served. And this ignores that Mr. Jean is facing a lengthy (and potentially consecutive) sentence in Connecticut for violating the terms of his 2020 sentence of probation. PSR ¶ 57. *Cf. Dean v. United States*, 581 U.S. 62, 67-70 (2017) (holding that, under § 3553(a), a court may

---

[15] While Mr. Jean was sentenced to a 10-year term in relation to his 2013 Connecticut conviction, 5-years of that sentence was suspended and the PSR makes it clear that Mr. Jean was only in custody for the 31 months between November 8, 2013 and June 20, 2016. Presumably (defense counsel, admittedly, is not an expert on Connecticut law), this is because CT ST § 54-125a allows for parole once a defendant has served half of an applicable sentence.

consider the effect of mandatory consecutive sentences when imposing sentences on other accounts).

In terms of general deterrence, a sentence of five-years provides ample deterrence. Evidence-based studies strongly support the conclusion that it is the certainty of being prosecuted rather than the severity of punishment that deters crime. *See* Nat'l Inst. of Just., Five Things About Deterrence, Jun. 6, 2016. The fact that Mr. Jean was arrested, detained, convicted and sentenced to five years of incarceration will provide sufficient general deterrence.

> D.     The Harsh Conditions of Mr. Jean's Confinement, and the Likelihood That Mr. Jean's Continued Incarceration Will Exacerbate Mr. Jean's PTSD and Depression, Constitute Grounds for a Significant Variance.

Mr. Jean was arrested on December 9, 2021 and was ordered detained and sent to the Westchester County Jail the following day. As this Court is well aware, COVID-19 has severely impacted day to day operations at the Westchester County Jail. COVID-19 related restrictions have caused Mr. Jean to face repeated periods of isolation and quarantine, as well as significantly restricted visitation and dramatically reduced jail programing. While the defense is not asking for a departure due to jail conditions, *see United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001), the COVID-19 pandemic is relevant under the applicable 3553(a) factors. Judges within this district have considered the impact of the pandemic on incarceration and have repeatedly lowered sentences accordingly. *See, United States v. De Jesus*, 20 Cr. 19 (S.D.N.Y. July 1, 2020) (sentencing defendant to time-served plus one day despite a guidelines recommendation of 30-37 months in part because of the COVID-19 related conditions at MCC); *United States v. Morgan*, 19 Cr. 209 (S.D.N.Y. May 5, 2020) (cutting the sentence to less than half of the low end of the Guidelines based in part on conditions at MDC); *United States v. Casillas*, 19 Cr. 863 (S.D.N.Y. May 4, 2020) (reducing the length of the sentence in part because of conditions at MCC during COVID019 crisis): *United States v. Pierson*, 14 Cr. 855 (S.D.N.Y. May 4, 2020) (same for defendant at MDC).

Mr. Jean is worthy of such a variance. Ordinarily, solitary confinement and isolation and the loss of privileges is reserved for individuals who commit infractions, but here Mr. Jean faced similarly harsh conditions for the majority of his incarceration despite having a clean disciplinary record. PSR ¶ 11. This is relevant to all defendants, but the harsh conditions Mr. Jean endured are especially relevant in this case because they worsened Mr. Jean's PTSD and depression. As detailed by Dr. Stanton,[16]

---

[16] Dr. Stanton is a psychiatrist who spent 20 years working for the Bureau of Prisons, most recently as the Chief of Psychiatry at FMC Rochester. As detailed in Dr. Stanton's declaration, the Federal Defenders retained Dr. Stanton to explore

> If one were to design the most stressful environment for an individual suffering from PTSD, they would be hard pressed to find one more stressful than the environment within a prison. . . . Mr. Jean's history of neglect and abuse by authority figures makes him particularly vulnerable to potential triggers within the prison environment. It also reduces an individual's access to coping mechanisms they may normally rely on (such as leaving or avoiding certain triggering situations or people). Mr. Jean's history indicates he has coped with increased stress related to his severe PTSD through socially isolating himself from stressful situations, engaging in substance abuse and at times resorting to suicidal fantasies and ideation to deal with intolerable symptoms. Of greatest concern would be his history of suicidal ideation. Although he has never made a suicide attempt, it is highly likely incarceration will trigger intermittent suicidal ideation. . . . Within the BOP, individuals expressing suicidal thinking are typically placed on suicide watch within a segregated housing unit. Residing in segregated housing even for a short time is an extremely stressful and dehumanizing experience, and Mr. Jean's PTSD, anxiety and depression make him even more vulnerable to this stress.

> Declaration of Shelley R. Stanton, M.D., ¶ 29 (Dr. Stanton Decl.) (Ex. E).

As Dr. Stanton foresaw, the forced quarantines and isolation that Mr. Jean has experienced at the Westchester County Jail have significantly increased Mr. Jean's PTSD symptoms. Dr. Thomas explains,

> Since his incarceration at Westchester County Department of Corrections, Mr. Jean's thoughts of suicide and death have worsened. Mr. Jean stated, "I think about death so much that, you know when you die, you put something on your tombstone. I caught myself in my cell writing what I would put on my tombstone for hours. I was so depressed – I'm sitting there writing something on a piece of paper – Really putting effort into it like I'm going to kill myself. It's normal to me." He described how the lack of structure at Westchester County Department

---

how the BOP would accommodate Mr. Jean's PTSD, intellectual disability and substance abuse history.

Case 7:22-cr-00117-CS    Document 51    Filed 04/24/23    Page 20 of 24

The Honorable Cathy Seibel                                    Page **19** of **23**
United States v. Jacques Jean (22 Cr. 117)        Sentencing Submission (April 24, 2023)

> of Corrections had led to racing thoughts in which he is
> "thinking about a million things at once."
>
> Dr. Thomas Decl. ¶ 20 (Ex. C).

As detailed above, and expounded upon further in Dr. Stanton's declaration, the cumulative impact of Mr. Jean's PTSD and cognitive limitations is that his time in custody has been, and will continue to be, far more punitive than that for healthy individuals. This is because Mr. Jean's PTSD will worsen in custody, and he will be vulnerable to exploitation and manipulation because "individuals with even mild cognitive impairments are highly vulnerable to exploitation and manipulation". Dr. Stanton Decl, ¶¶ 19, 25-27. "The trial judge cannot close his or her eyes to the conditions a particular defendant being sentenced will necessarily experience in prison. . . . [T]he prison environment must be considered by the sentencing judge in estimating total harm and benefits to prisoner and society—a utilitarian as well as a compassionate exercise." *United States v. D.W.*, 198 F.Supp.3d 18, 23 (E.D.N.Y. 2016). For this reason, a sentence beyond five-years would amount to an excessive sentence.

> E.    <u>Leniency is Warranted Because Mr. Jean Will Not Receive Adequate Care for His Mental Illness While in BOP Custody and Because He Will Suffer More Acutely than Most Detainees.</u>

In determining an appropriate sentence, "18 USC § 3553(a)(2)(D) requires the district court to consider the need for future medical or correctional treatment in devising a sentence". *United States v. Williams*, 65 F.3d 301, 307 (2d Cir., 1995). As discussed above and in Dr. Stanton and Dr. Hamlett's declarations, Mr. Jean suffers from decades of substance abuse, has a significant intellectual disability and severe PTSD, conditions for which Mr. Jean has never been properly treated. Dr. Hamlett Decl. (Ex. A), Thomas Decl, (Ex. C). Mr. Jean needs are twofold: he needs services to address his intellectual impairments and evidence-based, disability-informed treatment for his PTSD, substance use, and grief. Dr. Thomas Decl (Ex. B) ¶ 45.

Unfortunately, Mr. Jean will not receive any of these essential treatments in BOP custody. The reasons for this is simple: BOP's programs are extremely limited and, to the extent that they do exist, they will not accommodate Mr. Jean's significant intellectual disability.

As detailed by Dr. Stanton, BOP mental health, vocational and educational programming will not be accessible to Mr. Jean. Dr. Stanton Decl, ¶ 25 (Ex. E). BOP's policies do not mandate that accommodations be made for individuals with intellectual disabilities and the additional staffing and resources that would be

required to accommodate Mr. Jean render these services unavailable for Mr. Jean. *Id.* Dr. Stanton explains,

> Mr. Jean's significant impairments and disabilities require extensive programmatic adaptations and adjustment for him to receive adequate educational, vocational, and psychological treatment in the BOP or in the community. The BOP would not be able to adequately meet these treatment needs. The programs in the First Step Act, which includes treatment programs for substance abuse, mental disorders and PTSD, faith-based programs, occupational/vocational programs, programs addressing criminal thinking, financial management, among others, are standardized to reading levels in the 8th grade level.
>
> Dr. Stanton Decl. ¶ 25 (Ex. E).

In terms of Mr. Jean's PTSD and substance abuse, for decades Mr. Jean has self-medicated by using substances to help cope with his severe trauma. Because of this, Mr. Jean needs integrated substance abuse treatment and disability-informed Cognitive Processing Therapy. Dr. Thomas Decl. ¶ 51-52 (Ex. C). These treatments are not provided by BOP. Dr. Stanton Decl. ¶ 38 (Ex. E).

To be sure, the BOP does offer very limited treatment for PTSD and substance abuse. But Mr. Jean is not likely to receive such services, and, even if he does, it would be ineffective because the programs are not integrated and would not be adapted to accommodate Mr. Jean's intellectual disability. Dr. Stanton Decl, ¶ 25 (Ex. E). In terms of treatment for PTSD, while PTSD treatment is available at all female institutions within the BOP, only 6 male prisons offer PTSD programing. That treatment is provided through the BOP's Resolve Program, which is limited to 12 individuals, and is manual driven, meaning that the program is based on a workbook that requires reading, writing and homework. *Id.*, ¶¶ 30-33. This program requires significant reading and analytical skills and the written material assumes an 8th grade reading level. *Id.,* ¶¶ 25, 33. But Mr. Jean's comprehends at the third-grade level and the BOP would not be able to change the program to accommodate Mr. Jean's intellectual disability. *Id.*, ¶ 33. Similarly, while the BOP does offer substance abuse programming, those programs are "not designed for individuals with intellectual disabilities" and are only suitable for individuals with cognitive capabilities "well beyond Mr. Jean's intellectual abilities." *Id.*, ¶ 34-35.

As detailed in Dr. Stanton's declaration, while in BOP custody Mr. Jean will not receive the sustained, comprehensive PTSD treatment that he needs, and his condition will therefore deteriorate. Similarly, Mr. Jean will not receive effective substance abuse treatment, and because of Mr. Jean's intellectual disability, the

BOP's vocational programming will not help Mr. Jean.  This means that Mr. Jean's custodial sentence will not provide him with "needed educational or vocational training, medical care, or other correctional treatment." 18 U.S.C. § 3553(a)(2)(D). Mr. Jean's health and rehabilitation matter—a sentence beyond five-years, therefore, would be grossly excessive.

> F.   <u>Mr. Jean's Need for Treatment is Significant and Justifies a Variance, Especially in Light of the Services that Comprehensive Services that Mr. Jean Will Receive Upon his Release.</u>

The Court must consider the factors discussed above, specifically those set forth in 18 U.S.C. § 3553(a).  But a sentencing court must also recognize "that imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582.  This is especially true for Mr. Jean, whose needs *cannot* be met by the BOP and who, due to his significant intellectual disability, is eligible to receive significant services upon his release from prison.

As documented by Dr. Hamlett, Mr. Jean has a significant intellectual disability that relates to his "processing, storing, recalling, and retrieving information, particularly verbal information, from his long-term memory stores." Dr. Hamlett Decl. ¶ 76 (Ex. A).  Based on Dr. Hamlett's testing, Mr. Jean "meets criteria for an Intellectual Disability (ID)" based on his full-scale IQ of 65.  *Id.* ¶ 77. Dr. Hamlett concludes,

> Given his history, current findings, and neurobiological research, Mr. Jean's cognitive impairments may be best described, from a broad perspective, as severe deficits in executive functioning.  That is, difficulties with the management of cognitive operations that include attention, information processing, self-regulation, cognition, decision-making, working memory, and information/problem solving. . . .   Notably, it is quite possible that these pervasive brain impairments are linked to inutero drug and alcohol exposure. . . .
>
> . . . In sum, present findings indicate that Mr. Jean has an intellectual disability which suggest global impairments in intellectual and adaptive functioning with relative strengths and weaknesses.  In light of these challenges, Mr. Jean requires structured, intensive educational and life skills support and instructions.
>
> Dr. Hamlett Decl, ¶ 113, 116 (Ex. A).

Fortunately, intensive services geared towards Mr. Jean's disability are within reach.  The Connecticut Department of Disability/Developmental Services (DDS) is a state agency that provides "comprehensive and residential services for

individuals [like Mr. Jean] with intellectual disabilities." Dr. Thomas Decl. ¶ 46 (Ex. C). Dr. Thomas has concluded that Mr. Jean's intellectual disability renders him eligible for these services. *Id.* Because of this, Mr. Jean has applied for services through DDS and an eligibility hearing is expected to take place in May.

In preparation for this hearing, the Federal Defenders in Connecticut retained David W. Lovejoy, a neuropsychologist, to confirm that Mr. Jean indeed suffers from an intellectual disability that would entitle him to comprehensive services through DDS. Neuropsychological Consultation by David W. Lovejoy, Psy.D. ("Neuropsychological Consultation") (Ex. F). Dr. Lovejoy met with Mr. Jean on April 21, 2023 and conducted another battery of intellectual tests which confirmed that Mr. Jean suffers from an intellectual disability.[17] *Id.* P. 8-9 (Ex. F). As detailed in Dr. Lovejoy's report,

> [S]tandardized testing has demonstrated that Jacques displays impairments in both intellectual and adaptive functioning that are greater than two standard deviations away from the population means associated with the tests. The available information (collateral reports, school records, job records etc.) indicates a long-standing (since childhood) pattern of struggles in adaptive functioning and cognitive functioning that are consistent with the results of objective and psychological testing. I am in agreement with Dr. Hamlett's conclusion that this clinical scenario supports a diagnosis of an intellectual disability as defined by the statue.

> *Id.* P. 10.

Upon Mr. Jean's anticipated receipt of services through Connecticut's DDS, Mr. Jean will be given a comprehensive needs assessment that, once implemented, will provide Mr. Jean with daily support, including potential placement in a residential group home. *See* James P. Welsh Letter ("Welsh Letter") (Exhibit G). Additionally, DDS will work to ensure that Mr. Jean finally receives the evidence-based, disability-informed treatment that Mr. Jean needs to finally combat his PTSD and defeat his addiction. *See* Dr. Thomas Decl. ¶ 46 (Ex. C). This is relevant to Mr. Jean's sentence. Upon release from BOP custody, Mr. Jean will finally have the structure and support that his conditions require. *See* Dr. Thomas Decl. ¶ 48 ("Safety and stability are considered a 'necessary ingredient' for trauma therapy. . . . Mr. Jean must receive intensive disability services, including a structured group home environment, to achieve the necessary safety and stability (both in the basic

---

[17] Dr. Lovejoy's 2023 testing placed Mr. Jean's full-scale IQ at 63, two points lower than Dr. Hamlett's testing had revealed in 2019. *Compare* Neuropsychological Consultation, P. 8 (Ex. F) *with* Dr. Hamlett Decl. ¶ 77 (Ex. A).

The Honorable Cathy Seibel                                    Page **23** of **23**
United States v. Jacques Jean (22 Cr. 117)          Sentencing Submission (April 24, 2023)

needs and psychological safety) to engage in evidence-based, disability-informed trauma therapy").

　　　Under these circumstances, and especially in light of the reality that Mr. Jean will *not* receive adequate treatment while incarcerated, it is clear that every additional day that Mr. Jean spends incarcerated is a day that he is not receiving the treatment he needs to finally beat his longtime struggles with trauma, substance abuse, and cognitive difficulties.  A lengthy prison term, therefore, would only delay Mr. Jean's recovery and would – in an unreasonably and cruel manner – unnecessarily prolong Mr. Jean's extreme, trauma related struggles that are actively causing him pain *today*.[18]

　　　In sum, through the highly structured Support Court program Mr. Jean was able to maintain continued sobriety and employment, which proves that Mr. Jean has the capability and drive to live a law abiding life.  We now know that Mr. Jean's intellectual disability and his unique mental health difficulties require additional, sustained support, which should soon be made available to Mr. Jean through DSS.  For this reason, a sentence greater than five-years would unnecessarily curtail Mr. Jean's treatment, and would therefore be excessive.

*    *    *

　　　There is nothing to be gained by a draconian sentence in this case.  Indeed, a lengthy sentence would only delay Mr. Jean's rehabilitation and exacerbate his PTSD, which serves no penological purpose and would amount to a cruel sentence.  For the reasons set forth above, I respectfully ask that the Court to impose a sentence of sixty months.

　　　Thank you for your consideration of this request.

Respectfully,

//s

Benjamin Gold<br>Assistant Federal Defender

cc:　　Assistant U.S. Attorney Steven J. Kochevar

---

[18] As detailed in Dr. Thomas's report, "Since his incarceration at Westchester County Department of Corrections, Mr. Jean's thoughts of suicide and death have worsened. . . .  He described how the lack of structure at Westchester County Department of Corrections had led to racing thoughts in which he is 'thinking about a million things at one time.'"  Dr. Thomas Decl. ¶ 20 (Ex. C).