

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 1, 2023

**BY ECF**
The Honorable Cathy Seibel
United States District Judge
Southern District of New York
The Hon. Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas Street
White Plains, New York 10601-4150

   **Re:**   *United States v. Jacques Jean*, **22 Cr. 117 (CS)**

Dear Judge Seibel:

  The Government respectfully submits this letter in advance of the May 11, 2023, sentencing of the defendant Jacques Jean. The parties dispute whether certain of the defendant's prior convictions under Connecticut law qualify as controlled substance offenses and, accordingly, the appropriate calculation of the defendant's Guidelines Range. If any of the defendant's prior convictions under Connecticut law count as a controlled substance offense, then the defendant's Guidelines range is 188 to 235 months' imprisonment (the "Career Offender Guidelines Range"). However, if none of the defendant's convictions under Connecticut law count as a controlled substance offense, then the defendant's Guidelines range is 120 to 150 months' imprisonment (the "Non-Career Offender Guidelines Range"). Although some of the defendant's personal circumstances are mitigating, the defendant has an extensive criminal history and sold firearms, fentanyl, and cocaine to an undercover police officer. Accordingly, the Government submits that a sentence within the Non-Career Offender Guidelines Range would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

  **I.**   **Offense Conduct and Procedural History**

  Between on or about May 26, 2021, and December 9, 2021, Jean arranged and, except for the final sale, completed in person nine sales of cocaine, fentanyl and/or firearms to an undercover police officer with the New York State Police (the "UC"). (PSR ¶¶ 15-24).

  Specifically, on or about May 26, July 27, July 29, August 5, September 2, 2021, and November 26, 2021, Jean sold the UC, in person, cocaine or fentanyl. (PSR ¶¶ 15-19, 22).

On or about October 31, 2021, Jean sold the UC, in person, a green Glock-style 9mm semi-automatic handgun without identifying serial numbers for $1,400. (PSR ¶ 20). Jean handed the UC the firearm in the UC's vehicle in the parking lot of Jean's residence. (PSR ¶ 20).

On or about November 18, 2021, Jean sold the UC fentanyl, a green Glock-style 9mm semi-automatic handgun without identifying serial numbers, and a black Glock-style 9mm semi-automatic handgun without identifying serial numbers. (PSR ¶ 21). Jean gave the UC these items in the UC's vehicle in the parking lot of Jean's residence. (PSR ¶ 21). Jean received $5,600 in return.

On December 9, 2021, the UC contacted Jean to arrange a purchase of fentanyl and two firearms. (PSR ¶ 23). Jean informed the UC that Jean would send a female individual to deliver the fentanyl and firearms to the UC. (PSR ¶ 23).[1] Jean later informed the UC that Jean could only sell the UC a single firearm. (PSR ¶ 23). The UC exchanged text messages with Jean which included a photograph of the firearm that Jean would sell to the UC later that day. (PSR ¶ 23).

On December 9, 2021, the UC met Jean's co-conspirator in the parking lot of a retail store in Port Chester, New York. (PSR ¶ 24). In the UC's vehicle in the parking lot, Jean's co-conspirator gave the UC a bag containing fentanyl and a Taurus G2S 9 mm pistol bearing serial number TLU69202. (PSR ¶ 25). In exchange, the UC gave Jean's co-conspirator $4,800. (PSR ¶ 25).

On December 9, 2021, law enforcement agents executed a search warrant at Jean's residence. (PSR ¶ 27). During execution of the warrant, law enforcement agents observed two small bags and a glove containing approximately 22 grams in total of a substance that field-tested positive for heroin, numerous empty packages, a sifter, and empty glassine envelopes. (PSR ¶ 27). Law enforcement agents also recovered 16 rounds of ammunition from Jean's residence, specifically 11 rounds of .380 ammunition and five rounds of 9 mm ammunition, and an empty .45 caliber magazine. (PSR ¶ 27). Immediately thereafter, law enforcement agents arrested Jean. (PSR ¶ 27).

For the duration of the foregoing offense conduct, Jean was on probation in connection with his January 31, 2019, guilty plea in the District of Connecticut to possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). (PSR ¶ 28). On or about November 23, 2020, he was sentenced to four years of probation in that case. (PSR ¶ 28).

In total, Jean is being held accountable for approximately 231 grams of fentanyl, approximately 260 grams of heroin, and approximately 130.7 grams of cocaine. (PSR ¶ 31).

Jean was ordered detained on consent following his arrest. (ECF No. 2). On February 23, 2023, a six-count Indictment (the "Indictment") was filed against Jean, charging him with distribution of fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) (Count One); conspiracy to distribute fentanyl, in violation of 21 U.S.C. § 846 and 841(b)(1)(B) (Count Two);

---

[1] On March 31, 2023, Your Honor sentenced this individual to time served and five years' supervised release for her role in the conduct described herein. (ECF No. 49).

possessing a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count Three); the unlicensed sale of a firearm, in violation of 18 U.S.C. § 922(a)(5) (Count Four); conspiracy to engage in the unlicensed sale of a firearm, in violation of 18 U.S.C. § 371 (Count Five); and engaging in the unlicensed business of dealing firearms, in violation of 18 U.S.C. § 922(a)(1)(A). (ECF No. 18) (Count Six). On December 15, 2022, Jean pleaded guilty to Count Two. (ECF Entry dated December 15, 2022).

## II.    Guidelines Calculation

The parties dispute the appropriate Guidelines calculation.  In particular, the Government's position is that the defendant is a career offender pursuant to U.S.S.G. § 4B1.1 because he has at least two prior convictions for controlled substance offenses, including at least one of the defendant's prior convictions under Connecticut narcotics laws.  The defense argues that the defendant is not a career offender because none of the defendant's Connecticut convictions counts as a controlled substance offense for purposes of U.S.S.G. § 4B1.1.

### A.  Applicable Law

### i.        The Career Offender Guidelines and the Categorical Approach

U.S.S.G. § 4B1.1(a) provides that

A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.2(b) provides that

The term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

Courts must engage in either a "categorical approach" or a "modified categorical approach" in determining whether a prior sentence qualifies as a controlled substance offense. *United States v. Townsend*, 897 F.3d 66, 72–74 (2d Cir. 2018). Using the categorical approach, the Court looks only to the statute of conviction—as opposed to the conduct giving rise to the conviction. *Id.* at 73.

The Second Circuit has explained how to use the categorical approach in determining whether a state statute of conviction is a controlled substance offense:

> An element of a state offense categorically matches its federal counterpart if the state element is the same as, or narrower than the federal element…. With respect to controlled substances, that means the state law must criminalize only those substances that are criminalized under federal law. And because the analysis focuses on the "controlled substance" element—not the specific state conviction— we must presume that the conviction rested upon nothing more than the least of the acts criminalized by the state statute…. If a defendant might be convicted of violating [the state statute of conviction] for conduct that is not prohibited by the [Controlled Substances Act (the "CSA")], his state conviction cannot qualify as a predicate offense.

*Townsend*, 897 F.3d at 74 (quotation marks and citations omitted). In a Guidelines analysis, this Court must compare the state drug definition at the time of the predicate crime to the federal drug schedules at the time either of the current federal crime or the current federal sentencing. *United States v. Gibson*, 55 F.4th 153, 166–67 (2d Cir. 2022).

Where a state statute "on its face criminalizes conduct that is not covered by the federal analog", *United States v. Thompson*, 961 F.3d 545, 554 (2d Cir. 2020), the analysis is simple: the state statute is categorically broader than the CSA, and a conviction under that statute is not a controlled substance offense. *See, e.g.*, *Townsend*, 897 F.3d at 74–75 (New York State's statutory Schedule III expressly includes HCG, *see* N.Y. Pub. Health Law § 3306, Schedule III(g), which is not a controlled substance under the CSA); *Thompson*, 961 F.3d at 554 ("Because hCG is included in New York's list of covered compounds at N.Y. Pub. Health Law § 3306, NYPL § 220.31 on its face criminalizes conduct that is not covered by the federal analog at § 802(44)."); *Harbin v. Sessions*, 860 F.3d 58, 68 (2d Cir. 2017) ("In this case, however, N.Y. Pub. Health Law § 3306, which supplies the drug schedules that permit conviction under NYPL § 220.31, includes chorionic gonadotropin as a controlled substance. Chorionic gonadotropin is not a controlled substance under the CSA.").

However, "when a statute has an indeterminate reach, and where minimum conduct analysis invites improbable hypotheticals," there is a "backstop": a defendant must "show a realistic probability that the State would apply its statute to conduct that falls outside the generic definition of a crime." *Hylton v. Sessions*, 897 F.3d 57, 63 (2d Cir. 2018) (quotation marks omitted). This makes sense because, where "the overbreadth of [the state statute] is purely hypothetical and the product of impermissible legal imagination . . . such a characteristic would remove the supposed overbreadth from the calculation." *Thompson*, 961 F.3d at 554; *see also Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007) ("[T]o find that a state statute creates a crime outside the generic definition of a listed crime in a federal statute requires more than the application of legal imagination to a state statute's language."). "To show that a particular reading of the statute is realistic, a defendant 'must at least point to his own case or other cases in which the … courts in fact did apply the statute in the … manner for which he argues.'" *United States v. Hill*, 890 F.3d 51, 56 (2d Cir. 2018) (omissions in *Hill*) (quoting *Gonzales*, 549 U.S. at 193). "To that end, the categorical approach must be grounded in reality, logic, and precedent, not flights of fancy." *Id.*

ii.    The Connecticut Statutes and Regulations

The version of the Connecticut General Statutes § 21a-277 effective at the time of Jean's convictions (and through September 30, 2017) provided in relevant part

(a) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned . . . .

For the relevant period, a "narcotic substance" was defined in relevant part as

any of the following . . . :

(A) Morphine-type:

(i) Opium and opiate, and any salt, compound, derivative, or preparation of opium or opiate which are similar thereto in chemical structure or which are similar thereto in physiological effect and which show a like potential for abuse, which are controlled substances under this chapter unless modified;

(ii) any salt, compound, isomer, derivative, or preparation thereof which is chemically equivalent or identical with any of the substances referred to in clause (i), but not including the isoquinoline alkaloids of opium;

(B) cocaine-type, coca leaves and any salt, compound, derivative or preparation of coca leaves, and any salt, compound, isomer, derivatives or preparation thereof which is chemically equivalent or identical with any of these substances or which are similar thereto in physiological effect and which show a like potential for abuse, but not including decocainized coca leaves or extractions of coca leaves which do not contain cocaine or ecgonine;

Conn. Gen. Stat. § 21a-240(30) (reformatted for readability). A "controlled substance" was defined as "a drug, substance, or immediate precursor in schedules I to V, inclusive, of the Connecticut controlled substance scheduling regulations adopted pursuant to section 21a-243." Conn. Gen. Stat. § 21a-240(9). Schedule II of the regulations adopted pursuant to section 21a-243 (referred to in the foregoing definition) included the following substances:

(1) Opium and opiate, and any salt, compound, derivative, or preparation of opium or opiate excluding Apomorphine, Dextrorphan, Nalbuphine, Naloxone, Naltrexone, and their salts, but including the following: Raw opium, opium

extracts, opium fluid extracts, powdered opium, granulated opium, tincture of opium, codeine, dihydroetorphine, ethylmorphine, etorphine hydrochloride, hydrocodone, hydromorhone, metopon, morphine, oripavine, oxycodone, oxymorphone and thebaine;

(2) any salt, compound, isomer, derivative or preparation thereof which is chemically equivalent or identical with any of the substances referred to in paragraph (1), but not including the isoquinoline alkaloids of opium;

. . .

(4) coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions which do not contain cocaine or ecgonine;

Conn. Agencies Regs. § 21a-243-8(a)(1), (2), and (4). Note that Conn. Agencies Regs. § 21a-243-8(a)(4) is not relevant here because the definition of "cocaine-type" "narcotic substances" at Conn. Gen. Stat. § 21a-240(30)(B) does not refer to "controlled substances" in the way that the definition of "Morphine-type" "narcotic substances" at Conn. Gen. Stat. § 21a-240(30)(A) does. The Government has nonetheless included the portion of Schedule II referring to cocaine-type substances here for completeness.

### B.  Undisputed Aspects of the Defendant's Criminal History

The parties do not dispute that, if the defendant is a not career offender pursuant to § 4B1.1, the defendant's criminal history category is V, based on the defendant's twelve criminal history points. The defendant's criminal history includes the following prior convictions:

1.  The defendant pleaded guilty on or about December 10, 2004, in Connecticut Superior Court, to possession with intent to distribute narcotics, in violation of Connecticut General Statutes § 21a-277(a); larceny in the third degree, in violation of Connecticut General Statutes § 53a-124, and failure to appear in the second degree, in violation of Connecticut General Statutes § 53a-173, and was sentenced to two years' imprisonment.  Pursuant to U.S.S.G. § 4A1.2 Application Note 1, this sentence results in zero criminal history points.

2.  The defendant pleaded guilty on or about October 12, 2006, in Connecticut Superior Court, to possession with intent to distribute narcotics, in violation of Connecticut General Statutes § 21a-277(a) and was sentenced to three years' imprisonment.  Pursuant to U.S.S.G. § 4A1.2 Application Note 1, this sentence results in three criminal history points.[2]

---

[2] Although included here for completeness, the Government does not contend that any of Jean's convictions prior to 2011 qualify as controlled substance offenses for purposes of the career offender Guidelines. Accordingly, the Court need not reach the issue presented by footnote 6 of the defense's submission, concerning Jean's 2006 conviction.

3.  The defendant pleaded guilty on or about January 12, 2012, in Connecticut Superior Court, to possession with intent to distribute narcotics, in violation of Connecticut General Statutes § 21a-277(a) and was sentenced to 5 years' imprisonment, with six months to be served. Pursuant to U.S.S.G. § 4A1.2 Application Note 1, this sentence results in two criminal history points.

4.  The defendant pleaded guilty on or about February 6, 2013, in Connecticut Superior Court, to assault in the third degree, in violation of Connecticut General Statutes § 53a-61 and was sentenced to one year of imprisonment, with the execution suspended, and a conditional discharge of two years. Pursuant to U.S.S.G. § 4A1.1(a), this sentence results in one criminal history point.[3]

5.  The defendant pleaded guilty on or about November 8, 2013, in Connecticut Superior Court, to sale of a narcotic, in violation of Connecticut General Statutes § 21a-277(a), and was sentenced to 10 years' imprisonment, with the execution suspended after five years, and five years of probation. Pursuant to U.S.S.G. § 4A1.1(a), this sentence results in three criminal history points.

6.  The defendant pleaded guilty on or about January 31, 2019, in the United States District Court for the District of Connecticut, to possession with intent to distribute heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), and, on or about November 23, 2020, was sentenced to four years of probation. Pursuant to U.S.S.G. § 4A1.1(c), this sentence results in one criminal history point.

In addition, because the defendant committed the instant offense while on probation, pursuant to U.S.S.G. § 4A1.1(d), two additional criminal history points are added. Accordingly, the parties do not dispute that, in the event the defendant is not deemed a career offender, his criminal history category is V.

Although the defense's submission does not specifically address this issue, it implies and the Government's understanding is that it is undisputed that Jean's convictions under Connecticut General Statutes § 21-a277(a) in 2012 and 2013 (the convictions at issue in the career offender analysis) were for possessing heroin with intent to sell it or to selling heroin while on State probation. *See* Government's Memorandum of Law in Aid of Sentencing, *United States v. Jean*, 18 Cr. 153 (JCH) (D. Conn. September 25, 2020) (ECF No. 87), at 8. In other words, Jean's convictions are not for the distribution of hallucinogenic substances under Connecticut General Statutes § 21-a277(a). Accordingly, although the Court is technically applying a modified categorical approach because § 21-a277(a) is divisible because it "list[s] hallucinogenic substances and narcotic substances as discrete alternatives for a violation," *Chery v. Garland*, 16 F.4th 980, 985 (2d Cir. 2021), in practice there is no dispute as to the branch of § 21-a277(a) that applies, and so the Court is effectively applying the categorical approach to the branch of § 21-a277(a) dealing with narcotics substances, as defined above. The parties also do not dispute that the defendant's

---

[3] Assault in the third degree, in violation of Connecticut General Statutes § 53a-61, is a misdemeanor under Connecticut law and so does not count as a career offender predicate offense. *See* Conn. Gen. Stat § 53a-61(b); U.S.S.G. § 4B1.1(a).

federal conviction for possession with intent to sell heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), counts as a controlled substance offense.

The Government also does not dispute that, at the time Jean committed his offense and when the Government anticipates he will be sentenced, naloxegol, ioflupane, and certain isomers of cocaine were not controlled substances under federal law. Specifically, positional isomers of cocaine, as opposed to optical or geometric isomers of cocaine are not federal controlled substances. *See* 21 C.F.R. § 1300.01(b) ("As used in § 1308.12(b)(4) of this chapter [concerning cocaine and similar substances], the term "isomer" means any optical or geometric isomer.").

Accordingly, the disputed Guidelines question before the Court is whether or not the narcotic substances described in Conn. Gen. Stat. § 21a-240(30)(A)-(B) include naloxegol, ioflupane, or positional isomers of cocaine or if there is a realistic probability that they are included there. If they are included, there is a categorical mismatch between Connecticut "narcotic substance" offenses and federal law, such that Jean's prior convictions do not count as career offender predicates. However, as explained below, naloxegol, ioflupane, or positional isomers of cocaine are not covered by Conn. Gen. Stat. § 21a-240(30)(A)-(B), and there is no realistic probability Connecticut would apply its narcotics laws in that way. As a result, there is a categorical match between Connecticut's "narcotic substance" offenses and the federal Controlled Substances Act.

### C.  Connecticut's "Like Potential for Abuse" Requirement Means that its "Narcotic Substance" Offenses are a Categorical Match with the Federal Controlled Substances Act.

Connecticut "narcotic substance" offenses are a categorical match for the federal Controlled Substances Act. Connecticut law defined "[n]arcotic substance" to include, in part, "[o]pium and opiate, and any salt, compound, derivative, or preparation of opium or opiate which are similar thereto in chemical structure or which are similar thereto in physiological effect *and which show a like potential for abuse*." Conn. Gen. Stat. Ann. § 21a-240(30) (emphasis added). The same "like potential for abuse" standard appears in the portion of the definition defining cocaine: "cocaine-type; coca leaves and any salt, compound, derivative or preparation of coca leaves, and any salt, compound, isomer, derivatives or preparation thereof which is chemically equivalent or identical with any of these substances or which are similar thereto in physiological effect *and which show a like potential for abuse*." *Id.* (emphasis added).

Since neither naloxegol, ioflupane, nor positional isomers of cocaine have a *"*like potential for abuse," as opium, opiates, or cocaine, Connecticut law is a categorical match with federal law. This is consistent with Second Circuit precedent. For example, in *Gousse*, the Second Circuit found that "nalmefene" was not a proscribed "narcotic" under Connecticut law because it failed to meet the "like potential for abuse" standard despite being an opiate derivative. *Gousse v. Ashcroft*, 339 F.3d 91, 100 (2d Cir. 2003). The court rested its holding on a study which found that nalmefene had "no abuse potential at all" and an FDA-approved drug label declaring that a branded version of nalmefene hydrochloride had "not been shown to produce tolerance, physical dependence, *or abuse potential*." *Id.* (emphasis in *Goussse*). The court also noted that "[t]here are no reported Connecticut cases in which someone was prosecuted for a drug crime involving nalmefene." *Id.* at 100 n.7.

Given equally strong evidence that naloxegol, ioflupane, and positional isomers of cocaine do not have a "like potential for abuse," the reasoning in *Gousse* should apply and the court should find a categorical match.[4]

Naloxegol and ioflupane do not meet Connecticut's "like potential for abuse" standard because of their low (or non-existent) potential for abuse. In *Gibson*, the Second Circuit recognized that the Secretary of Health and Human Services recommended in 2013 that naloxegol be removed from CSA schedules after considering its "abuse potential" and "dependence susceptibility." *United States v. Gibson*, 55 F.4th 153, 163 (2d Cir. 2022). The court also noted that the U.S. Drug Enforcement Administration "f[ound] that naloxegol does not possess abuse or dependence potential" and removed it from the CSA schedules in 2015. *Id.* Similarly, "ioflupane has not been a federally 'controlled substance' . . . since September 2015." *United States v. Jackson*, 36 F.4th 1294, 1302 (11th Cir. 2022).

The attached DEA findings, concerning the descheduling of naloxegol and ioflupane, show that these substances do not have a "like potential for abuse" as opium and coca leaves, respectively. *See* DEA-2014-0014-0002 at 3 (naloxegol) (Exhibit A); DEA-2015-0010-004 at 6 (ioflupane) (Exhibit B).

Positional isomers of cocaine also do not meet Connecticut's "like potential for abuse" standard for three reasons. First, the legislative history of Congress's statutory definition of cocaine indicates Congress was aware of positional isomers and did not view them as problematic. Congress amended the scope of its controlled substance laws in the 1980s in response to the so-called "isomer defense" where drug manufacturers altered product structures to evade prosecution. A Senate report issued around the amendments stated:

---

[4] *Gousse* also forecloses the defense's sole argument concerning Connecticut's "like potential for abuse" requirement—that the rule of last antecedent requires that the phrase "which show a like potential for abuse" modifies only the phrase referencing substances similar in "physiological effect." *See* Defense Sentencing Submission, Exhibit D ("Def. Mem. Ex. D"), ECF No. 51-4, at 6 n.4. (quoting Conn. Gen. Stat. § 21a-240(30)). *Gousse* applied the "like potential for abuse" requirement to nalmefene, an opiate derivative. *See Gousse*, 339 F.3d at 100. Specifically, *Gousse* stated

> [h]owever, there is no basis for concluding that nalmefene is within the statutory definition of "narcotic substance" in Conn. Gen.Stat. § 21a–240(30)(A)(i), which includes only such opiate derivatives as "are similar [to opium and opiates] in chemical structure or which are similar thereto in physiological effect and *which show a like potential for abuse*." Conn. Gen.Stat. § 21a–240(30)(A)(i) (emphasis added).

*Gousse*, 339 F.3d at 100 (emphasis in original). *Gausse* then went on to discuss the abuse potential of nalmefene, clearly reading the "like potential for abuse" requirement as determinative to whether nalmefene was criminalized by Connecticut law. This forecloses the defense's argument that the "like potential for abuse" requirement is limited only to the last preceding item on the list in the statute.

> Isomers include optical, positional, and geometric isomers. In many instances, substances listed in Schedules I and II (see 21 U.S.C. 812(c)) include drugs and their isomers. . . . Because of the absence of a clear definition of what is meant by the term "isomer," clandestine manufacturers have attempted to circumvent the law by manufacturing positional and geometric isomers of hallucinogens in Schedule I and optical and geometric isomers of cocaine. Indeed, this practice with respect to cocaine has given rise to frequent assertion of what is termed the "isomer defense." Isomers of dangerous drugs often elicit similar harmful pharmacological effects, and have no legitimate commercial use. The definition of the term "isomer" set out in [this] amendment of 21 U.S.C. 802 will assure that those isomers requiring control under the controlled substances act are clearly covered by the statute.

S. Rep. 98-225, 263, 1984 U.S.C.C.A.N. 3182, 3445; *see also United States v. Puglisi*, 790 F.2d 240, 242 n.1 (2d Cir. 1986) (noting that the amendments were "intended to render the 'isomer defense' ineffective").

In *United States v. Ruth*, 966 F.3d 642 (7th Cir. 2020), the federal public defender representing the defendant cited this Senate report to note that Congress had "pointedly declined to prohibit positional isomers of cocaine":

> Congress only felt that optical and geometric isomers of cocaine required control. . . . Congress was well aware of the different types of cocaine isomers. It was well aware of the 'isomer defense' in courts around the country. And it was conscious when it decided which specific isomers the federal government would outlaw. Congress has pointedly declined to prohibit positional isomers of *cocaine*, while outlawing them for other drugs."

Brief and Required Short Appendix of Defendant-Appellant, Nathaniel Ruth, 2020 WL 957188, at *17-*19, *United States v. Ruth*, 966 F.3d 642 (7th Cir. 2020).

The Government also made this argument in *United States v. Wallace*, 991 F.3d 810 (7th Cir. 2021):

> [T]he Senate Report tied to the enactment of the relevant federal definition of cocaine stated that "clandestine manufacturers have attempted to circumvent the law by manufacturing positional and geometric isomers of hallucinogens in Schedule I and *optical and geometric isomers of cocaine*. . . ." In other words, when Congress included only those isomers in its definition, it was because only those isomers had been observed as a problem in the illicit drug trade.

Brief for the United States, 2020 WL 3476509, at *52-*54, *United States v. Wallace*, 991 F.3d 810 (7th Cir. 2021)

Second, positional isomers of cocaine are not thought to be psychoactive. In *United States v. Myers*, 2021 WL 9849459 (W.D. Mo. Sept. 17, 2021), the government submitted a declaration from Scott E. Denmark, Professor of Chemistry at the University of Illinois at Urbana-Champaign, stating that (1) given "difference[s] in structure . . . it is highly unlikely that [positional isomers of

cocaine] are psychoactive, though no biological tests are on record;" and (2) "whereas constitutional (positional) isomers of cocaine do exist (and the number of possible constitutional isomers is nearly infinite), none of them is naturally occurring and *none of them is likely to have any physiological activity*." Government's Second Supplemental Sentencing Memorandum Exhibit 36, at 6, *United States v. Myers*, 2021 WL 9849459 (W.D. Mo. Sept. 17, 2021) (No. 18-00092-01-CR-W-BP) (emphasis added) (Exhibit C).[5]

The lack of psychoactive properties is also supported by the fact that large samples of DEA cocaine cases have found no evidence of positional isomers. In *Ruth*, "the government submitted an affidavit of a retired DEA research chemist, John Casale . . . [who] during his tenure at the DEA . . . analyzed over 50,000 cocaine samples from law enforcement evidentiary seizures and did not identify any positional isomers of cocaine in any of those samples." *United States v. Ruth*, 966 F.3d 642, 648 (7th Cir. 2020). Moreover, in *Myers*, the government submitted a declaration from DEA Senior Chemist Valerie Colley explaining "that in the 12,000 cocaine submissions she has analyzed or technically reviewed, she has not identified any positional isomers of cocaine." Brief for the United States, 2022 WL 363410, at *5, *United States v. Myers*, No. 21-3443 (8th Cir. 2021).

Third, consistent with their lack of psychoactive properties, positional isomers of cocaine are extremely rare. In *O'Neal*, the government submitted a declaration from Layne Morsch, Associate Professor of Organic Chemistry at the University of Illinois Springfield, stating that:

> Positional isomer is not a term used by chemists, however one might infer that a positional isomer would be a constitutional isomer that keeps all of the similar groups of another molecule but has them attached at different positions. Positional isomers then could be considered a very small subset of the larger group of constitutional isomers. Positional isomers of cocaine have never been shown to occur naturally. They have been synthesized in the laboratory at least 3 times as

_____

[5] To be clear, if the defense is arguing that the Connecticut statutes criminalize all constitutional isomers of cocaine, not just positional isomers of cocaine, the Government incorporates the arguments set forth herein against that position, with appropriate modifications where the materials set forth herein refer specifically or only to positional, as opposed to all constitutional, isomers of cocaine. The Government's understanding is that, although there is some imprecision around the term, there are two positional isomers of cocaine, among a "nearly infinite" number of constitutional isomers (which technically would include any molecule containing seventeen carbon atoms, twenty-one hydrogen atoms, one nitrogen atom, and four oxygen atoms in any configuration). *See* Exhibit C (explaining the concept of isomerism); Exhibit D (also explaining isomers). In addition, with respect to the much broader category of constitutional isomers, the Government also submits that reading the Connecticut statutes to criminalize a "nearly infinite" number of substances, most of which are effectively theoretical and none of which are actually cocaine, would be fanciful. *See Raftopol v. Ramey*, 299 Conn. 681, 703 (Conn. 2011) ("[W]e construe a statute in a manner that will not … lead to absurd results.") (omission in original) (quoting *Kelly v. New Haven*, 275 Conn. 580, 616 (Conn. 2005)); *see also United States v. Hill*, 890 F.3d 51, 56 (2d Cir. 2018) ("[T]he categorical approach must be grounded in reality, logic, and precedent, not flights of fancy.").

reported in the literature with the first report in 1896 followed by reports in 1955 and 1975.

Supplemental Return to Order to Show Cause Exhibit B, at 3, *O'Neal v. Krueger*, No. 218CV00306JPHMJD, 2020 WL 4207753 (S.D. Ind. July 22, 2020) (Exhibit D).

Similarly, in the briefing on the petition for certiorari in *Alexis v. Barr*, 141 S. Ct. 845 (2020) (denying certiorari), the Government relied on several studies underscoring the rarity of positional isomers of cocaine. Brief for the Respondent in Opposition, at 8, *Alexis v. Barr*, 141 S. Ct. 845 (2020). In particular, the Government submitted evidence that (1) "[p]ositional isomers of cocaine must be synthesized in the laboratory," *id.* (citing F. Ivy Carroll et. al., *Cocaine Receptor: Biochemical Characterization and Structure-Activity Relationships of Cocaine Analogues at the Dopamine Transporter*, 35 J. Med. Chem. 969, 969 (1992)); and (2) that positional isomers of cocaine "have been created on only a handful of occasions documented in the chemical literature." *Id.* (citing Robert L. Clarke & Sol J. Daum, β-Cocaine, 18 J. Med. Chem. 102, 102-103 (1975)).

Courts in several circuits have acknowledged the government's argument regarding the rarity of positional isomers of cocaine. *See, e.g.*, *United States v. Holmes*, No. 21-CR-147 (NGG), 2022 WL 1036631, at *8 (E.D.N.Y. Apr. 6, 2022) ("Positional isomers of cocaine are apparently rare in the drug trade . . . because they must be synthesized in laboratory . . . . But they *do* chemically exist and were known to exist when the New York Legislature added the term 'isomers' to the definition of cocaine in 1978." (citations omitted)); *United States v. Myers*, 56 F.4th 595, 599 (8th Cir. 2022) ("The government also raises arguments about the non-existence of positional isomers in the drug trade, such that Missouri would have no reason to criminalize them . . . . [But absent ambiguity] [b]ecause the text of the Missouri drug schedule plainly criminalized all isomers of cocaine, our inquiry ends there."); *United States v. Ruth*, 966 F.3d 642, 648 (7th Cir. 2020) ("[T]he government next argues that there is no basis to conclude that positional isomers of cocaine exist in the drug trade. . . . This may be so, but [the affidavit of a retired DEA research chemist] does not actually aver that positional isomers of cocaine do not exist.").

While these arguments to date have been rejected on the grounds that "isomer" unambiguously includes positional isomers regardless of rarity, Connecticut's *state-specific* "like potential for abuse" standard supports the argument that positional isomers of cocaine are not prohibited. Their rarity is itself evidence of their low potential for abuse. Supporting this logic, there does not appear to be any case in which Connecticut prosecuted a defendant for possessing or distributing positional isomers of cocaine.[6]

In *United States v. Smith*, No. 3:21-cr-202 (JBA), 2023 WL 1350271, at *3 (D. Conn. Jan. 31, 2023), a district court in Connecticut recently held that Connecticut law extends to naloxegol and positional isomers of cocaine. However, the *Smith* Court overlooked Connecticut's "like potential for abuse" requirement. In particular, in regard to naloxegol, *Smith* misconstrued the Second Circuit's reasoning in *Gibson*. *Smith* relied on *Gibson* to hold that Connecticut law also extended to naloxegol since its statutory language matched that of New York—i.e., that "narcotic

---

[6] A Westlaw search for Connecticut cases containing all of "isomer," "positional," and "cocaine" resulted in zero cases.

substance" includes "opium or opiate, or any salt, compound, derivative, or preparation of opium or opiate." *United States v. Smith*, No. 3:21CR202 (JBA), 2023 WL 1350271, at *3 (D. Conn. Jan. 31, 2023). But Smith overlooked the fact that New York law does not include the requirement that an opiate derivative have a "like potential for abuse." Since *Smith* relied on the mistaken conclusion that Connecticut and New York law were "identical," *id.*, this Court should not follow it.

In regard to positional isomers of cocaine, *Smith* again based its holding on a case concerning New York law and overlooked Connecticut's "like potential for abuse" requirement. In particular, *Smith* reasoned that Connecticut "regulates 'any . . . isomer' of coca leaves, while the CSA more narrowly defines 'isomer' with respect to cocaine as 'any optical or geometric isomer.'" *Id. Smith* grounded its reasoning on a recent Eastern District of New York case which held that "any isomer" includes "positional" isomers—whereas federal law only prohibits "optical" and "geometric" isomers. *United States v. Holmes*, No. 21-CR-147 (NGG), 2022 WL 1036631, at *7 (E.D.N.Y. Apr. 6, 2022).[7] However, as with naloxegol, *Smith* mistakenly reasoned that Connecticut and New York law were "identically worded" and thereby overlooked Connecticut's "like potential for abuse" requirement. *See Smith*, No. 3:21CR202 (JBA), 2023 WL 1350271, at *3.

Based on the foregoing, neither naloxegol, ioflupane, nor positional isomers of cocaine are included in Connecticut's "narcotic substance" offenses. Accordingly, there is a categorical match between Connecticut General Statutes § 21a-277 and the federal Controlled Substances Act.

### D. Even if Connecticut's Statute is Ambiguous, the Defendant Cannot Satisfy the Realistic Probability Test.

Even if the court finds that Connecticut law is not a categorical match by its express terms, defendants are unable to satisfy the realistic probability test. When the scope of a state statute is ambiguous, courts apply the realistic probability test. *Hylton v. Sessions*, 897 F.3d 57, 64 (2d Cir. 2018) (noting that "[t]here are cases in which a separate realistic probability inquiry remains necessary because the elements of the state statute alone do not provide sufficient guidance on its application"); *see also Jack v. Barr*, 966 F.3d 95, 98 (2d Cir. 2020) ("[T]he realistic probability test applies only to statutes 'of indeterminate scope' and 'has no role to play in the categorical analysis … when the state statute of conviction on its face reaches beyond the … federal definition.'" (omissions in *Jack*) (quoting *Williams*, 960 F.3d at 77-78)).[8]

---

[7] *Holmes* is consistent with holdings in several other circuits. See, e.g., *United States v. Myers*, 56 F.4th 595, 598 (8th Cir. 2022) ("The federal definition, however, criminalizes only optical and geometric isomers—but not positional isomers. 21 U.S.C. §§ 802(14), 812, sched. II(a)(4); 21 C.F.R. § 1308.02. Because Missouri's definition of cocaine included positional isomers while the federal definition does not, the Missouri definition is unambiguously broader than its federal counterpart."); *United States v. Gott*, No. 3:20-CR-108, 2023 WL 362388, at *7-9 (M.D. Pa. Jan. 23, 2023) (adopting the Eastern District of New York's reasoning in *United States v. Holmes*, No. 21-CR-147 (NGG), 2022 WL 1036631 (E.D.N.Y. Apr. 6, 2022)).

[8] The defense's argument that the Court should apply the "rule of the last antecedent," a canon of statutory construction, *see* Def. Mem. Ex. D. at 6 n.4, implies that the defense believes that the

In immigration cases, the burden of showing a realistic probability that an ambiguous state statute sweeps more broadly than federal law is on the party asserting a mismatch. *Matthews v. Barr*, 927 F.3d 606, 618 (2d Cir. 2019) (placing burden on petitioner in immigration case where there was a categorical match between the state and federal statutes) ("*Moncrieffe*[ *v. Holder*, 569 U.S. 184 (2013)] and *[Gonzalez v.] Duenas-Alvarez*[, 549 U.S. 183 (2007)] suggest that it is a noncitizen's burden to establish a realistic probability of being convicted for conduct outside the federal definition, at least in cases where the state and federal statutes appear to be a categorical match."). A party asserting a mismatch can rebut the government's claim of a categorical match by showing that the state statute sweeps more broadly on an applied basis. *See Kerr v. Garland*, No. 21-6504, 2023 WL 193629, at *1 (2d Cir. Jan. 17, 2023) ("[E]ven if there is an apparent categorical match between the state statute and the generic federal definition, a petitioner can still prevail if he or she demonstrates that there was a 'realistic probability that a state would apply the [state] statute to conduct beyond the generic definition.'" (alteration in *Kerr*) (quoting *Williams v. Barr*, 960 F.3d 68, 78 (2d Cir. 2020)).

The Government is not aware of any cases in which Connecticut prosecuted the possession or distribution of naloxegol, ioflupane, or positional isomers of cocaine.[9] Since the test requires evidence that the state statute sweeps broader on an as-applied basis, *Matthews*, 927 F.3d at 618-20, the defendant cannot meet their burden and Connecticut law is in fact a categorical match. This holding would be consistent with cases in several sister circuits.

For example, in *Vega-Ortiz*, the Ninth Circuit found that a defendant had failed to show a "'realistic probability' that he would be prosecuted . . . for possession of . . . [a] product containing L-meth" which had been "excluded" from the federal schedule of controlled substances. *United States v. Vega-Ortiz*, 822 F.3d 1031, 1036 (9th Cir. 2016). The state law did not "expressly include

---

statute is ambiguous because canons of statutory interpretation are typically applied to ambiguous statutes. *See United States v. Colasuonno*, 697 F.3d 164, 173 (2d Cir. 2012) ("Only if we discern ambiguity do we resort first to canons of statutory construction, and, if the meaning remains ambiguous, to legislative history."). As explained above, *see supra* note 4, *Gousse* forecloses the defense's argument based on the rule of the last antecedent, but, if the Court entertains it, it should apply the realistic probability test as well.

[9] Westlaw searches for cases in the state of Connecticut containing the keywords "naloxegol" or "ioflupane" returned zero results. Searches for cases containing "cocaine analogue" (a term sometimes used in place of ioflupane) also returned zero results. Searches for cases containing "Movantik" or "Moventig" (trade names of naloxegol) also returned zero results. Finally, searches for cases containing all of "isomer," "position," (sometimes used in place of "positional"), and "cocaine" returned four results, none of which are prosecutions for the possession or distribution of naloxegol, ioflupane, or positional isomers of cocaine. *See State v. Padua*, 273 Conn. 138 (Conn. 2005); *State v. Freitas*, 2000 WL 1918006 (Conn. Dec. 21, 2000); *State v. Kiser*, 43 Conn. App. 339 (Conn. App. Ct. 1996); *Reynolds v. Warden*, 2011 WL 3200300 (Sup. Ct. Conn. June 28, 2011).

conduct not covered by the generic offense, but rather [wa]s silent as to the existence of a parallel [L-meth] exception." *Id.* (alteration in original).

Likewise, in *Taylor*, the Eastern District of Michigan cited the Ninth Circuit's reasoning in *Vega-Ortiz* to find that a defendant had "failed to show a 'realistic probability' that he could be prosecuted under Michigan law for possession of ioflupane." *United States v. Taylor*, No. 20-CR-20449, 2022 WL 3447596, at *7 (E.D. Mich. Aug. 17, 2022). The government had argued that Michigan law did not prohibit ioflupane because its controlled substances statute excluded "substances that are 'in a proportion or concentration to vitiate the potential for abuse.'" *Id.* at *5. The court held that the statute was "silent as to" ioflupane and that the defendant had failed to meet their burden under the realistic probability test. *Id.* at *6-7.

Finally, in *Bourtzakis*, the Middle District of Florida held that a party appealing their denial of naturalization due to an aggravated felony conviction had not shown a realistic probability that Washington would prosecute defendants for "administering" a controlled substance. *Bourtzakis v. Sessions*, No. 3:17-CV-0062-J-20JRK, 2018 WL 7252936, at *1-2, *6 (M.D. Fla. Jan. 10, 2018). The case concerned a discrepancy between the federal Controlled Substances Act which exempted "administering or dispensing" controlled substances from its definition of "deliver" and Washington's law which contained no such exemption. *Id.* at *4. The court rejected the party's argument that the state statute swept more broadly, noting that "[p]laintiff has not pointed to any Washington case where a defendant was prosecuted or convicted for 'administering' a controlled substance." *Id.* at *6. The Eleventh Circuit subsequently affirmed but noted that, through other terminology, federal law did in fact prohibit "administering" such that there was no discrepancy. *Bourtzakis v. United States Att'y Gen.*, 940 F.3d 616, 625-26 (11th Cir. 2019).

Given that the defendant cannot point to any cases in which Connecticut prosecuted the possession or distribution of naloxegol, ioflupane, or positional isomers of cocaine, the realistic probability test cannot be satisfied and Connecticut law is a categorical match. However, as noted in Part II.C, *supra*, Second Circuit precedent shows the court can reach this conclusion based on the express terms of Connecticut law without resorting to the realistic probability test in the first place.

### E.   The Defendant's Guidelines Range if He is a Career Offender is 188 to 235 Months' Imprisonment.

If the Court determines that Jean is a career offender pursuant to U.S.S.G. § 4B1.1(a), then, pursuant to U.S.S.G. § 4B1.1(b)(2), because the statutory maximum sentence for Count Two of the Indictment is 25 years or more, the base offense level is 34.  Removing three levels for acceptance of responsibility, the offense level for Count Two would be 31. Pursuant to U.S.S.G. § 4B1.1(b), if the defendant is a career offender, his Criminal History Category is VI. Accordingly, if the Court determines that Jean is a career offender, his Guidelines range would be 188 to 235 months' imprisonment, with a minimum term of 60 months' imprisonment.

**F.   The Defendant's Guidelines Range if He is Not a Career Offender is 120 to 150 Months' Imprisonment.**

If the Court determines that Jean is not a career offender pursuant to U.S.S.G. § 4B1.1(a), then, pursuant to U.S.S.G. §§ 2D1.1(a)(5), 2D1.1(c)(6), and Application Note 8(B) & (D), the base offense level would 28, because the offense involved between 700 and 1,000 KG of Converted Drug Weight.[10] Pursuant to U.S.S.G. § 2D1.1(b)(1), two levels would be added because a firearm was possessed. Removing three levels for acceptance of responsibility, the offense level for Count Two would be 27. As noted above in Part II.B and based on the criminal history information set forth therein, the parties do not dispute that, in the event the defendant is not deemed a career offender, his criminal history category is V. Accordingly, if the Court determines that Jean is not a career offender, his Guidelines range would be 120 to 150 months' imprisonment, with a minimum term of 60 months' imprisonment.

**III.   Discussion**

**A.  Applicable Law**

The Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker,* 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant;

---

[10] Specifically, the offense involved approximately 231 grams of fentanyl, approximately 260 grams of heroin, and approximately 130.7 grams of cocaine, which is converted pursuant to the Drug Conversion Tables to approximately 863 KG of Converted Drug Weight. (PSR ¶ 30).

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B.  The Appropriate Sentence

A sentence within the Non-Career Offender Guidelines Range of 120 to 150 months' imprisonment would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing. Jean received a significantly below-Guidelines sentence of four years' probation on his conviction for distributing heroin in the District of Connecticut. *See United States v. Jean*, 18 Cr. 153 (JCH) (D. Conn. September 25, 2020) (ECF No. 99). But he did not stop dealing drugs. Instead, while he was still on probation, he began selling fentanyl and cocaine to an undercover police officer. And, more importantly, he also sold him guns. The Court is well aware of the opioid crisis in this country and this District—and of the heavy toll in human lives and misery it has exacted. The Court is also well aware of the devastating effects of gun violence in this District and throughout the country, and does not need to be reminded of the dire risk of violence created when firearms are trafficked with narcotics. Jean chose to contribute to both crises—opioids and guns—even after being shown extraordinary leniency by a federal court. Accordingly, deterrence and just punishment require that the Court now impose a substantial sentence of imprisonment. Both general and specific deterrence call for a substantial sentence here: the Court should not only send a message to the community that dealing guns and drugs will not be tolerated, but also should communicate to Jean that he cannot continue his criminal conduct.

Probation recommends a below Guidelines sentence of 90 months. (PSR at 41-43). Although Probation acknowledges the seriousness of Jean's offense, it bases its recommendation in part on Jean's overlapping struggles with mental illness, an intellectual disability, drug addiction, and a difficult upbringing. To be clear, Jean has faced serious challenges over the course of his life and, in particular, the confluence of these four different, but interlocking, challenges may be exceptional. The Government agrees that, to some extent, these combined challenges are mitigating and, in light of them and their confluence, the Court does not necessarily need to impose a sentence in the Career Offender Guidelines Range of 188 to 235 months' imprisonment. However, the Government believes that Jean's mitigating circumstances do not warrant a sentence below the Non-Career Offender Guidelines range, including because Jean already received a substantially below-Guidelines sentence on his last federal narcotics distribution conviction. Moreover, Jean's conduct in this case involved firearms—which apparently were not part of the conduct underlying his prior federal conviction—indicating not only recidivism but also a worsening of criminal conduct. A sentence of at 120 to 150 months' imprisonment would therefore be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

### IV.     Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the Non-Career Offender Guidelines Range of 120 to 150 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney


by:   ___*/s/ Steven J. Kochevar*___
Steven J. Kochevar
Assistant United States Attorney
(212) 637-2262

cc:      Ben Gold Esq. (by ECF)