# Federal Defenders
## OF NEW YORK, INC.

Southern District
81 Main Street, Suite 300
White Plains, N.Y. 10601-4150
Tel: (914) 428-7124  Fax: (914) 948-5109

David E. Patton
*Executive Director*
*and Attorney-in-Chief*

*Southern District of New York*
*Jennifer L. Brown*
*Attorney-in-Charge*

May 5, 2023

<u>Via Email and ECF</u>

The Honorable Cathy Seibel
United States District Court Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

      Re:    United States v. Jacques Jean
             22 Cr. 117 (CS)

Dear Judge Seibel:

      We write to respond to certain of the arguments that the government raised in its May 1, 2023, sentencing submission concerning the application of the career offender enhancement. We also write to supplement Mr. Jean's submission with letters that were recently obtained from him and members of his family.

      Regarding the career offender guideline, the government's submission makes it clear that the parties' dispute is narrow. The parties agree that the categorical approach is the correct test to apply, and that in undertaking that analysis, the Court must compare Connecticut's definition of narcotics at the time of Mr. Jean's state convictions with the federal drug schedules at the time of his commission of this federal offense or at sentencing. Gov. Sentencing Letter, ECF No. 55, at 3-4. The parties also agree that the narcotics prong of C.G.S. § 21a-277(a) applies and that it is indivisible as to the type of narcotic involved in Mr. Jean's offense. *Id.* at 7.[1] Further, the government agrees that, at the time of the commission of the current federal offense, naloxegol, ioflupane, and certain isomers of cocaine were not (and are currently not) controlled substances under federal law. *Id.* at 8. Finally, although the government fails to acknowledge that it has the burden of proving that Mr. Jean is a career offender, we assume that there is no dispute on this well-settled point. *See United States v. Moreno*, 821 F.3d 223, 227 (2d Cir. 2016).

---

[1] Although we agree with the government that the narcotics prong of C.G.S. § 21a-277(a) applies, the record does not contain sufficient information to permit a finding that the substance involved in Mr. Jean's prior state convictions was heroin.

Accordingly, the only dispute is whether Connecticut's definition of narcotic drugs includes naloxegol, ioflupane, or isomers of cocaine in addition to those that are federally controlled. If Connecticut included any one of those substances in its definition of narcotics at the time of Mr. Jean's prior convictions, then Mr. Jean is not a career offender.

I.     **Connecticut's Definition of Narcotics Unambiguously Includes Substances That Are Federally Legal**

Clear legal authority demonstrates that, at the time of Mr. Jean's 2012 and 2013 state convictions,[2] Connecticut included naloxegol, ioflupane, and *all* isomers of cocaine in its definition of narcotics, while the applicable federal law does not.

Contrary to the government's assertion, the text of C.G.S. § 21a-240(30) is unambiguous: the "like potential for abuse" clause applies only to the phrase referencing substances similar to opium and cocaine in "physiological effect," not substances like naloxegol and ioflupane that are similar in "chemical structure."[3] The government's sole authority for its argument that the "like potential for abuse" clause applies more broadly, *Gousse v. Ashcroft*, 339 F.3d 91, 100 (2d Cir. 2003), is inapposite. In *Gousse*, the Court considered whether C.G.S. § 21a-277(a) constituted a conviction for "illicit trafficking in a controlled substance" under the Immigration and Nationality Act ("INA"). In explaining the statutory landscape— in a quotation that the government omitted—the Court noted that Connecticut's definition of opium and its derivatives "also embraces substances 'which are similar thereto in physiological effect and which show a like potential for abuse.'" *Id.* at 97 (quoting C.G.S. §21a-240(30)(A)(i)). The Court's excerpt of the statute suggests that it viewed the "like potential for abuse" clause as applying only to substances similar in "physiological effect." If the Court believed that the "like potential for abuse" clause also applied to substances similar in "chemical structure," it would have said so. Later on in the opinion, while discussing whether nalmefene was a narcotic in Connecticut, the Court quoted the longer phrase in the statute, and concluded that

---

[2] The government appears to concede that Mr. Jean's 2006 conviction cannot count as a predicate offense for purposes of the career offender enhancement. Gov. Sentencing Letter, ECF No. 55, at 6 n.2.

[3] The government erroneously claims that, by merely referencing a canon of statutory construction, Mr. Jean admits that the statute is ambiguous. Gov. Sentencing Letter, ECF No. 55, at 13 n.8. The government misreads Mr. Jean's argument on this point, which is that the "statutory language is clear," meaning unambiguous, and that a commonly applied canon of statutory construction provides further support for the plain meaning of the text. Def. Sentencing Letter, Ex. D, ECF No. 51-4, at 6 n.4. We in no way suggested that the statute was ambiguous or that it is necessary to resort to canons of statutory construction to interpret it.

The Honorable Cathy Seibel                                          Page **3** of **8**
<u>United States v. Jacques Jean (22 Cr. 117)</u>                           May 5, 2023

the statute "embraces opiate derivatives that *inter alia* have a 'like potential for abuse.'"  *Id.* at 100.  It is unclear whether the Court viewed nalmefene as similar to opium in "chemical structure" or "physiological effect," or what other characteristics it meant by "*inter alia.*"  Further compounding *Gousse's* ambiguity, neither party made the argument that Mr. Jean advances here.  *See generally Gousse* Pet. Br., 2003 WL 23336167; *Gousse* Respondent Br, 2003 WL 23340516.  Indeed, in his reply brief, the Petitioner claimed that nalmefene "can result in physiological symptoms like those caused by other opiates," suggesting that it fit within the "physiological effect" portion of the Connecticut's narcotics definition.  *Gousse* Pet. Reply Br., 2003 WL 23336168, *8.  Given the ambiguity in the opinion and the fact that the Court was not presented with Mr. Jean's argument, it cannot be said to dictate the outcome here.

Another aspect of Connecticut narcotics statute supports a limited application of the "like potential for abuse" clause.  Several other definitions of illicit substances in C.G.S. § 21a-240 contain "like potential for abuse" clauses, all of which, apart from the clauses in the narcotics definition, are set off by a comma. For example, "amphetamine-type substances" are defined to "include amphetamine, optical isomers thereof, salts of amphetamine and its isomers, and chemical compounds which are similar thereto in chemical structure or which are similar thereto in physiological effect, and which show a like potential for abuse, . . . ." C.G.S. § 21a-240(4).  The definitions of barbiturate-type substances, cannabis-type substances, and marijuana each contain the same "like potential for abuse" clause and each is offset from its antecedents by a comma.  *Id.* § 21a-240(5), (7), and (29). The absence of the comma separating the "like potential for abuse" clause from its antecedents in the narcotics definition—which is the only definition missing a comma—is significant.  A rule of statutory construction "corollary" to the rule of last antecedent provides that "a modifier set off from a series of antecedents by a comma should be read to apply to each of those antecedents."  *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 335 (2d Cir. 2011) (quotation marks and alterations omitted).  Where a modifier is "not set off from its antecedents by a comma," that rule "does not apply."  *Id. See also Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 781–82 (2d Cir. 2013) ("One of the methods by which a writer indicates whether a modifier that follows a list of nouns or phrases is intended to modify the entire list, or only the immediate antecedent, is. . . by whether the list is separated from the subsequent modifier by a comma. When there is no comma. . . the subsequent modifier is ordinarily understood to apply only to its last antecedent.").  Although the statute is not ambiguous, the rule of construction regarding commas informs the Court's analysis of the narcotics definition.

Importantly, as for cocaine isomers, the government completely ignores *United States v. Brown*, 21-cr-214, ECF No. 50 (D. Conn. Apr. 5, 2023), in which the Court held that "Connecticut does not limit in any fashion the nature or type of cocaine isomer that falls within the definition of narcotic substance," rendering the

Connecticut statute "categorically broader" than federal law.  Significantly, the *Brown* court was confronted with the government's "like potential for abuse" argument as to the opiates clause of the narcotics definition, which is in the same paragraph as the cocaine definition, determined that it was unnecessary to decide that issue, and held that the Connecticut statute was overbroad as to cocaine isomers.  The government provides no explanation for why the Court should not follow *Brown*.

In sum, the "like potential for abuse" clause modifies only opium and cocaine derivatives that are similar in "physiological effect."  Accordingly, as the overwhelming weight of the authority makes clear, Connecticut's definition of narcotics includes naloxegol, ioflupane, and all isomers of cocaine.  The government's extended arguments about the abuse potential and rarity of those substances, which it acknowledges have been repeatedly rejected, are therefore irrelevant.  *See* Gov. Sentencing Ltr., ECF No. 55, at 9-12.  Although immaterial, the government's contentions concerning positional isomers of cocaine are particularly inapposite.  Assuming the government is correct that Congress was aware of positional isomers of cocaine and "did not view them as problematic," Gov. Sentencing Ltr., ECF No. 55, at 9, that is irrelevant.  What matters is whether *Connecticut*'s inclusion of "any isomer" of cocaine includes positional isomers.  As courts have repeatedly held, it does. *United States v. Smith*, No. 3:21-cr-202 (JBA), 2023 WL 1350271, at *3 (D. Conn. Jan. 31, 2023); *United States v. Brown*, 21-cr-214, ECF No. 50 (D. Conn. Apr. 5, 2023).  Indeed, the Connecticut legislature knew how to specify subtypes of isomers when it wanted to; for example, the definition of amphetamine-type substances includes in one clause only "optical isomers" of amphetamine.  C.G.S. § 21a-240(4).  The contrast between the specification of optical isomers of amphetamine and the broad prohibition of "any" isomer of cocaine shows that the Connecticut legislature deliberately chose the broadest possible definition of cocaine isomers.  The Court must honor that choice.  *Cf. United States v. Gutierrez-Campos*, No. 21-cr-40 (JPC), 2022 WL 281582, at *15 (S.D.N.Y. Jan. 31, 2022) (noting that "while New York *could have* chosen to define isomers of cocaine to include only optical and geometric isomers, like the federal definition, it simply chose not to") (emphasis original).

II.    **The "Realistic Probability" Test Does Not Apply Because Connecticut's Definition of Narcotics Plainly Includes Naloxegol, Ioflupane, and All Cocaine Isomers**

As the Second Circuit has repeatedly held, the "realistic probability" test has no role to play in a categorical analysis where the relevant state statutes are facially broader than the generic federal offense.  *See, e.g., Jack v. Barr*, 966 F.3d 95, 98 (2d Cir. 2020) (per curiam); *Williams v. Barr*, 960 F.3d 68 (2d Cir. 2020); *Hylton v. Sessions*, 897 F.3d 57, 63 (2d Cir. 2018).  This includes cases in which the

relevant mismatch involves an uncommon substance on the state drug schedules. *United States v. Thompson*, 961 F.3d 545, 554 (2d Cir. 2020) (rejecting application of "realistic probability" test to mismatch between New York and federal schedules involving human chorionic gonadotropin); *see also, e.g.*, *Hnatyuk v. Whitaker*, 757 F. App'x 10, 12 (2d Cir. Nov. 21, 2018) (same as to mismatch of Connecticut and federal opioid schedules).  The "realistic probability" test *only* applies as a "backstop" where discerning the minimum conduct prohibited by a statute requires the application of "legal imagination" or "improbable hypotheticals" rather than the statutory language itself.  *Hylton*, 897 F.3d at 63; *Williams*, 960 F.3d at 78.

In arguing that the "realistic probability" test applies, the government appears to suggest that, if Connecticut's statutes and schedules do not specifically enumerate naloxegol, ioflupane, and positional isomers of cocaine, then those substances are not prohibited on the face of the statute and "legal imagination" is required to infer their inclusion.  That contention is contrary to binding Second Circuit law, and, unsurprisingly, numerous courts have rejected it.

First, the "realistic probability" test does not apply where, as here, the statute at issue requires some amount of analysis to determine its scope.  *Williams v. Barr* is an example of this principle.  In *Williams*, the petitioner argued that his Connecticut firearms conviction was not a categorical match for the relevant firearms deportation ground because the state proscribed "*carry[ing]* any pistol or revolver upon [the] person" subject to an exception that applied to "*transporting* an antique pistol or revolver" when such antique was "unloaded"; the federal counterpart reached firearms offenses excluding "antique[s]" generally.  960 F.3d at 71-72 (citations omitted).  The court rejected the application of the realistic probability test, even though the state statute was "not a paragon of clarity."  *Id.* at 74.  The mismatch that the Court identified—a proscription under Connecticut law on carrying *loaded* antique firearms—does not appear "on the face" of the statute, in the sense the government urges here.  "Loaded antique firearms" are not identified by name in the proscription on "carrying" any more than positional isomers of cocaine are mentioned in the Connecticut drug schedule; an analysis of the reach of the terms used is required.  *See id.* at 78-79.  Although the issue required statutory analysis, the Court rejected the government's argument that the realistic probability test should apply, writing that: "the mismatch with the federal statute is not created by 'legal imagination' applied in the context of an apparent match, but by the state's statutory language itself."  *Id.* at 78 (quoting *Hylton*, 897 F.3d at 63).

*Gibson* further illustrates that the "reasonable probability" test is not relevant to assessing whether state and federal drug definitions categorically match.  There, the government did not contest at the district court that New York's

prohibition on all opium or opiate derivatives included naloxegol because it is an opium derivative and, unlike federal law, New York has no explicit exception for naloxegol. *United States v. Gibson*, 60 F.4th 720, 721-22 (2d Cir. 2023) (opinion on rehearing describing the government's shifting position on naloxegol overbreadth in New York). The Court also ruled that, since naloxegol is an opium derivative, and New York prohibited *all* opium derivatives, naloxegol was included in New York's drug definition. *Id.* at 723 (confirming that this was a holding of its original opinion). That is precisely the reasoning that the Court applied in *Smith*, and which also applies to ioflupane and cocaine isomers. *United States v. Smith*, No. 3:21-cr-202 (JBA), 2023 WL 1350271, at *3 (D. Conn. Jan. 31, 2023).

Unsurprisingly, then, Courts in this Circuit have uniformly rejected the government's attempt to apply the "realistic probability" test in similar circumstances. *See, e.g.*, Sentencing Tr. at 13, *United States v. Almonte*, 21-cr-566 (CS) (S.D.N.Y. July 11, 2022) ("I think the government's putting a little too much weight on the quote-unquote 'on its face' or 'indeterminate reach' issue. On its face, the New York statute includes isomers, and on its face, the federal one includes only some isomers, and I don't really see how on its face the New York statute could be read as meaning only some isomers as opposed to all isomers."); Exhibit A, Sentencing Tr. at 20-21, 30, 36, *United States v. Maiuzzo*, 22-cr-313 (KMK) (S.D.N.Y. Nov. 30, 2022) (referencing decisions from Judge Cronan, Judge Castel, Judge Garaufis, Judge Koeltl, Judge Buchwald, and Judge Engelmayer, each of whom rejected the government's argument that the "realistic probability" test applies to cocaine isomer overbreadth, noting that "every other judge, as far as we can tell, within the Second Circuit disagrees" with the government's argument). The government's out-of-circuit authority, to the extent it is to the contrary, cannot displace *Gibson*, *Williams*, and the weight of the caselaw in this Circuit, including Your Honor's prior ruling in *Almonte*.

Following this precedent, the realistic probability test does not apply simply because the statute requires some careful reading and straightforward analysis. It only applies where "the application of legal imagination to that language[]," rather than the statute itself, "creates the realistic probability that a state would apply the statute to conduct beyond the generic definition." *Williams*, 960 F.3d at 78 (internal quotation omitted). No such imagination is required here, since a plain reading of the Connecticut statute and regulations includes naloxegol, ioflupane, and all cocaine isomers. As explained above and in Exhibit D to Mr. Jean's sentencing submission, the mismatch between the Connecticut narcotics definition and the federal drug schedules is much simpler than the government tries to make it seem:

- Like New York, Connecticut includes all opiate derivatives in its definition of narcotics. Federal law explicitly excludes naloxegol. ECF No. 51-4 at 6-7.

The Honorable Cathy Seibel                                          Page **7** of **8**
United States v. Jacques Jean (22 Cr. 117)                          May 5, 2023

- Like many other states, Connecticut's definition of narcotics includes all derivatives of cocaine with no exception for ioflupane.  Federal law specifically exempts ioflupane. ECF No. 51-4 at 8-9.

- Like New York, Connecticut prohibits *any* isomer of cocaine, while federal law specifically includes only optical and geometric isomers of cocaine.  ECF No. 51-4 at 9-10.

Given these straightforward mismatches between Connecticut's definition of narcotics and the federal definition, the Court may not resort to the "realistic probability" test.


III.    **Sixty Months is the Appropriate Sentence**

The government's perfunctory discussion of the Section 3553(a) factors fails to justify the sentence that it seeks, which far exceeds Probation's recommendation. The government points out that Mr. Jean did not stop selling drugs after his prior conviction, but it leaves out crucial facts that mitigate Mr. Jean's return to drug sales.  For example, after a period in which he made great progress in Support Court and excelled at his job as a flagger, Mr. Jean lost his job due to the pandemic and his cousin was murdered, activating his PTSD and disrupting his more recent successes.  Destitute, inhibited by his intellectual disability, and without the helpful structure that kept him together during his time in Support Court, Mr. Jean again started using drugs and returned to the familiar world of drug sales.  None of this is meant to minimize the seriousness of his offense: Mr. Jean feels deep remorse for letting his family and community down by putting drugs on the streets and for succumbing to the UC's suggestion to sell him guns.  In Mr. Jean's own words,

> I deeply apologize for the crimes I committed in 2021 and also my past crimes.  There are no excuses for the crimes I committed.  I know the crimes I committed could have hurt someones [sic] family member [sic] life or death especially the guns that were involved.  I feel really guilty about my actions.  Exhibit B.

Given Mr. Jean's remorse, his limitations, and that his prior sentence was probation, a sixty-month sentence—a large escalation in punishment—will afford more than adequate specific deterrence.

Although the government briefly acknowledges Mr. Jean's "overlapping struggles" with mental illness, an intellectual disability, drug addiction, and difficult childhood, its proposed sentence of 120-150 months' imprisonment fails to account for the true gravity of those struggles and his other personal characteristics.  One of his seven sisters, Marie Jean, wrote that Jacques struggled with basic tasks as a child even while his other siblings could and did take care of

themselves.  He could not "go to the fridge and get things to eat," and "wouldn't even remember to shower if someone wasn't there to remind him."  Exhibit C.  He struggled in school and could not keep up, and, despite all his challenges, the family did not realize that he needed special education and they did not know how to help him.  *Id.*  Another sister, Sandra Jean Joseph, writes that she has recently had the opportunity to reflect on Mr. Jean's "profound functional impairments as an adult, in light of his diagnosis of an intellectual disability."  Exhibit D.  Specifically, she writes of his inability to understand job application forms and his failure to keep up with the work at the jobs he was able to get.  *Id.*  Stacey Lemy, the mother of Mr. Jean's son, echoes this sentiment, noting that he "had trouble doing certain tasks correctly," such as heating up food or going to the store to get supplies.  Exhibit E.  Mr. Jean's limitations are best addressed in a structured, supportive environment, which is why he has applied for additional services through DSS.

Finally, it is notable and mitigating that despite his struggles, Mr. Jean is a loving father who adores his children.  Ms. Lemy explains, "The bond between Jacques and ▓▓▓ is strong.  ▓▓▓ loves to cuddle with Jacques, which is not something he would do all the time with just anybody, not even me."  *Id.*  Marie Jean adds, "I know him to be a loving and caring father to his children.  I've seen him taking care of all his kids, and I know he wants the best for them.  Even now that he's incarcerated, he calls his daughter regularly on the phone."  Exhibit C.  And ▓▓▓, Mr. Jean's ▓▓▓▓▓▓▓▓▓▓▓, writes how Mr. Jean would take her to restaurants, parks, movie theaters and bouncy houses.  Exhibit F.

                              *    *    *

For the foregoing reasons, and for those stated in Mr. Jean's April 24, 2023, sentencing submission and the attached exhibits, Mr. Jean is not a career offender, and the most appropriate sentence is sixty months.

Thank you for your consideration of this letter.

                                        Respectfully,

                                        //s

                                        Benjamin Gold
                                        Lise Rahdert
                                        Federal Defenders of New York

cc:     Assistant U.S. Attorney Steven J. Kochevar